CASE NO. 15-5753

# United States Court of Appeals
# for the Sixth Circuit

JAVON MARSHALL, *et al.*,

*Plaintiffs-Appellants*,

v.

ESPN, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Middle District of Tennessee

## BRIEF OF NETWORK DEFENDANTS-APPELLEES

Evan R. Chesler
Roger G. Brooks
J. Wesley Earnhardt
**CRAVATH, SWAINE &
MOORE LLP**
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Tel:  (212) 474-1000
Fax:  (212) 474-3700

Nathan E. Siegel
**LEVINE SULLIVAN KOCH &
SCHULTZ, LLP**
1899 L Street, NW
Suite 200
Washington, DC 20036
Tel:  (202) 508-1184

Samuel David Lipshie
Joel D. Eckert
**BRADLEY ARANT BOULT
CUMMINGS LLP**
1600 Division Street
Suite 700
Nashville, TN 37203-0025
Tel:  (615) 244-2582
Fax:  (615) 252-6380

*Attorneys for Defendants-Appellees ESPN, Inc., ABC, Inc., ESPN d/b/a SEC
Network, and ESPN d/b/a Longhorn Network*


James W. Quinn
Yehudah L. Buchweitz
Gregory Silbert
Eric S. Hochstadt
**WEIL, GOTSHAL & MANGES
LLP**
767 Fifth Avenue
New York, NY 10153
Tel:  (212) 310-8000
Fax:  (212) 310-8007

R. Dale Grimes
Jeffrey P. Yarbo
**BASS, BERRY & SIMS PLC**
150 Third Avenue South
Suite 2800
Nashville, TN 37201
Tel:  (615) 742-6200

*Attorneys for Defendant-Appellee CBS Broadcasting Inc.*


Arthur J. Burke
Dana M. Seshens
**DAVIS POLK & WARDWELL
LLP**
450 Lexington Avenue
New York, NY 10017
Tel:  (212) 450-4000
Fax:  (212) 701-5800

Kelli L. Sager
**DAVIS WRIGHT TREMAINE
LLP**
865 Figueroa Street, Suite 2400
Los Angeles, CA 90017
Tel:  (213) 633-6800
Fax:  (213) 633-6899

R. Dale Grimes
**BASS, BERRY & SIMS PLC**
150 Third Avenue South
Suite 2800
Nashville, TN 37201
Tel: (615) 742-6200

*Attorneys for Defendant-Appellee NBCUniversal Media, LLC (sued as National Broadcasting Company, Inc.)*

Kevin T. Baine
John E. Schmidtlein
Thomas G. Hentoff
Carl R. Metz
**WILLIAMS & CONNOLLY LLP**
725 12th Street, NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

**HAL D. HARDIN**
211 Union Street
Suite 200
Nashville, TN 37201
Tel: (615) 369-3377

*Attorneys for Defendants-Appellees Fox Broadcasting Company (sued as FOX, Inc.) and Big Ten Network, LLC (sued as Big Ten Network Services, LLC)*

# CORPORATE DISCLOSURE STATEMENTS

Pursuant to Sixth Circuit Rule 26.1, Network Defendants-Appellees make the following disclosures:

ABC, Inc.:  Defendant ABC, Inc.'s ultimate parent is The Walt Disney Company ("Disney"), a publicly traded company.  There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

Big Ten Network, LLC:  Twenty-First Century Fox, Inc. is a publicly traded company.  Appellee Big Ten Network LLC is a limited liability company. Its members are Fox B10 Channel Partner, Inc. and Big Ten Network Holdings, LLC.  Fox B10 Channel Partner, Inc. is a wholly owned subsidiary of Fox Sports Net, Inc. and a wholly owned indirect subsidiary of Fox Cable Networks, Inc., Fox Networks Group, Inc., Fox Entertainment Group, LLC, FEG Holdings LLC, 21st Century Fox America, Inc., and Twenty-First Century Fox, Inc.  There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

CBS Broadcasting Inc.:  CBS Corporation is a publicly traded company.  National Amusements, Inc., a privately held company, beneficially owns the majority of the Class A voting stock of CBS Corporation.  Otherwise, with respect to ownership of the Class A voting stock of CBS Corporation in the

i

amount of 10% or more, CBS Corporation is only aware, without inquiry, of the following information based upon filings made pursuant to Section 13(d) or Section 13(g) of the Securities and Exchange Act of 1934, as amended:  according to a Schedule 13D/A, dated February 25, 2011 and filed with the Securities and Exchange Commission on March 15, 2011, GAMCO Investors, Inc., along with certain entities and persons affiliated therewith (any of which may be publicly held), held shares representing, as of February 28, 2015, approximately 11.7% of CBS Corporation's Class A voting stock, based on such Schedule 13D/A.

ESPN, Inc.:  Defendant ESPN, Inc., is a subsidiary of The Walt Disney Company ("Disney"), which is a publicly traded company that holds an indirect shareholder interest in eighty percent (80%) of ESPN, Inc.  The Hearst Corporation indirectly holds the remaining twenty percent (20%) shareholder interest in ESPN, Inc.  There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

Fox Broadcasting Company:  Twenty-First Century Fox, Inc. is a publicly traded company.  Appellee Fox Broadcasting Company is a wholly owned subsidiary of Fox Networks Group, Inc. and a wholly owned indirect subsidiary of Fox Entertainment Group, LLC, FEG Holdings, LLC, 21st Century Fox America, Inc., and Twenty-First Century Fox, Inc.  There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

ii

<u>NBCUniversal Media, LLC</u>:  NBCUniversal Media, LLC (sued as National Broadcasting Company, Inc.) is indirectly owned by Comcast Corporation.  Comcast Corporation is a publicly held corporation.  No other publicly held corporation owns 10% or more of the equity of NBCUniversal Media, LLC.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ........................................i

TABLE OF AUTHORITIES ................................................................. vii

CITATION FORMS ........................................................................... xiv

STATEMENT REGARDING ORAL ARGUMENT ...........................xv

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUES...........................................................3

STATEMENT OF THE CASE..............................................................4

I.      PLAINTIFFS' COMPLAINT. ...................................................4

        A.      The Parties. ....................................................................4

                1.      Plaintiffs. ............................................................4

                2.      Defendants. .........................................................5

        B.      The NCAA's Amateurism Rules. ..................................5

        C.      The Broadcast of NCAA Football and Basketball Games....................6

II.     DEFENDANTS' MOTIONS TO DISMISS AND PLAINTIFFS'
        OPPOSITION. ...........................................................................8

III.    THE DISTRICT COURT'S DECISION......................................9

SUMMARY OF THE ARGUMENT ..................................................10

STANDARD OF REVIEW .................................................................13

ARGUMENT ........................................................................................13

I.  THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS'
    RIGHT OF PUBLICITY CLAIMS. .............................................13

    A.  The District Court Correctly Dismissed Plaintiffs' Claim Under
        the Tennessee Personal Rights Protection Act. ....................13

    B.  The District Court Correctly Dismissed Plaintiffs' Right of
        Publicity Claim Under Tennessee Common Law. ...............17

        1.  No Tennessee Case Has Recognized a Right of Publicity
            in Sports Broadcasts or Related Advertisements. ......17

        2.  Tennessee Common Law Should Not Now Recognize a
            Right of Publicity in Sports Broadcasts or Related
            Advertisements. ..........................................................18

        3.  Broadening Tennessee Common Law Would Conflict
            with the TPRPA, and the TPRPA Would Control. ....25

    C.  There Are No Publicity Rights in Sports Broadcasts or Related
        Advertisements for Important Policy Reasons. ...................28

II. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS'
    ANTITRUST CLAIM. ...................................................................31

    A.  The District Court Correctly Dismissed Plaintiffs' Antitrust
        Claim Because They Failed To Allege Injury in Fact. ........32

    B.  The District Court Correctly Dismissed Plaintiffs' Antitrust
        Claim Because They Failed To Allege Any Antitrust Injury. ............36

    C.  Plaintiffs Cannot Plausibly Allege That the Network
        Defendants Entered into an Agreement To Achieve an
        Unlawful Purpose. ...............................................................38

        1.  Plaintiffs Cannot Plausibly Allege That the Broadcast
            Agreements Are Intended To Achieve an Unlawful
            Objective. ...................................................................40

        2.  The Network Defendants Are Not Parties to the NCAA
            Amateurism Rules. ......................................................41

3.    The NCAA Amateurism Rules Do Not Violate Section 1 of the Sherman Act. ..................................................42

III.   THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' LANHAM ACT CLAIM...................................................44

A.    Sports Broadcasts and Related Advertisements Are Not Commercial Speech................................................44

B.    The Complaint Fails Plausibly To Allege False Endorsement. ..........47

C.    Even if Plaintiffs Had Properly Pleaded Endorsement, the *Rogers* Test Would Apply and Bar Plaintiffs' Claims......................50

IV.   THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' OTHER STATE LAW CLAIMS. ...................................51

V.   COPYRIGHT PREEMPTION AND THE FIRST AMENDMENT PROVIDE ALTERNATIVE BASES FOR AFFIRMING THE DISTRICT COURT........................................................51

A.    The Federal Copyright Act Preempts the State Law Claims. .............51

B.    The First Amendment Would Also Bar Plaintiffs' Purported Rights of Publicity.................................................53

1.    The First Amendment Protects Noncommercial Speech About Matters of Public Interest...............................53

2.    The *Rogers* Test Bars the State Law and Right of Publicity Claims. ...................................................56

VI.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DISMISSING PLAINTIFFS' COMPLAINT WITH PREJUDICE.............57

CONCLUSION ........................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16 Casa Duse, LLC v. Merkin*, 791 F.3d 247 (2d Cir. 2015) ..................................31

*Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012) ......................................................43

*Apple Corps Ltd. v. A.D.P.R.*, 843 F. Supp. 342 (M.D. Tenn. 1993) ......................14

*Armstrong v. Eagle Rock Entm't*, 655 F. Supp. 2d 779 (E.D. Mich. 2009) ...........52

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................13

*Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d
545 (6th Cir. 2007) ................................................................................................13

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
Carpenters*, 459 U.S. 519 (1983) .........................................................................35

*Balt. Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d
663 (7th Cir. 1986) ..................................................................................18, 52, 53

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ..............................................................53

*Bassett v. NCAA*, 528 F.3d 426 (6th Cir. 2008) ................................................36, 43

*Baugh v. CBS, Inc.*, 828 F. Supp. 745 (N.D. Cal. 1993) ........................................15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)............................ 13, 38, 39, 40-41

*Bolger v. Young Drugs Prods. Corp.*, 463 U.S. 60 (1983) ......................................45

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ..........................................36

*Burnett v. Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962
(C.D. Cal. 2007) ....................................................................................................47

*C.B.C. Distrib. & Mktg. v. Major League Baseball Advanced Media,
L.P.*, 505 F.3d 818 (8th Cir. 2007)........................................................................54

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959
(10th Cir. 1996)................................................................................................ 46-47

*Chuy v. Phila. Eagles Football Club*, 431 F. Supp. 254 (E.D. Pa.
1977), *aff'd*, 595 F.2d 1265 (3d Cir. 1979) (en banc) ........................................19

*Clark v. Viacom Int'l, Inc.*, No. 3:12-0675, 2014 WL 1934028 (M.D.
Tenn. May 13, 2014), *aff'd*, 617 F. App'x 495 (6th Cir. 2015) ........................14

*Crissen v. Gupta*, 994 F. Supp. 2d 937 (S.D. Ind. 2014)..........................................5

*Cummings v. ESPN Classic, Inc.*, No. 08-cv-0718, 2009 WL 650559
(S.D. Ill. Mar. 9, 2009) ........................................................................................15

*Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967) ....................................................19

*Dixon v. Clem*, 492 F.3d 665 (6th Cir. 2007) ........................................................51

*Dora v. Frontline Video, Inc.*, 18 Cal. Rptr. 2d 790
(Ct. App. 1993) .....................................................................................................19

*Dryer v. Nat'l Football League*, 689 F. Supp. 2d 1113
(D. Minn. 2010) ("*Dryer I*") ...............................................................................24

*Dryer v. Nat'l Football League*, No. CIV. 09-2182 PAM/AJB,
2013 WL 5888231 (D. Minn. Nov. 1, 2013) ("*Dryer II*") ................................29

*Dryer v. Nat'l Football League*, 55 F. Supp. 3d 1181 (D. Minn. 2014)
("*Dryer III*")....................................................................................................passim

*ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915 (6th Cir. 2003) .........................passim

*Farah v. Esquire Mag., Inc.*, 863 F. Supp. 2d 29 (D.D.C. 2012) ...........................47

*Gaines v. NCAA*, 746 F. Supp. 738 (M.D. Tenn. 1990) ..........................................43

*Gauck v. Karamian*, 805 F. Supp. 2d 495 (W.D. Tenn. 2011).........................15, 25

*Gautier v. Pro-Football, Inc.*, 107 N.E.2d 485 (N.Y. 1952) ...................................18

*Gionfriddo v. Major League Baseball*, 114 Cal. Rptr. 2d 307
(Ct. App. 2001) ................................................................................................19, 54

*Graves v. Ill. Cent. R.R. Co.*, 148 S.W. 239 (Tenn. 1912) ......................................25

*Groden v. Random House, Inc.*, 61 F.3d 1045 (2d Cir. 1995)..................................45

*Guglielmi v. Spelling-Goldberg Prods.*, 603 P.2d 454 (Cal. 1979)........................20

*Guy v. Mut. of Omaha Ins., Co.*, 79 S.W.3d 528 (Tenn. 2002) ........................26, 27

*Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603 (6th Cir. 2009) ...................44, 47, 50

*Hilliard v. U.S. Postal Serv.*, 814 F.2d 325 (6th Cir. 1987) ....................................40

*Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001) ..............21, 23

*In re Canadian Import Antitrust Litig.*, 470 F.3d 785 (8th Cir. 2006) .............35, 38

*In re NCAA Student-Athlete Name & Likeness Litig.*, 990 F. Supp. 2d 996
(N.D. Cal. 2013) ("*O'Bannon I*") ...............................................24, 34

*In re NCAA Student Athlete Name & Likeness Litig.*, 37 F. Supp. 3d
1126 (N.D. Cal. 2014) ("*O'Bannon II*")...........................................23, 24, 25, 34

*Int'l Logistics Grp. v. Chrysler Corp.*, 884 F.2d 904 (6th Cir. 1989) ..............34, 41

*Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509 (7th Cir. 2014) ..........................46

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) ..............................40, 42

*Kiser v. Reitz*, 765 F.3d 601 (6th Cir. 2014)....................................................32, 33

*KTSP-TAFT Television & Radio Co. v. Ariz. State Lottery Comm'n*,
646 F. Supp. 300 (D. Ariz. 1986) ........................................................30

*Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435 (6th Cir. 2014) .................57

*La. Sch. Bd. Emps' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471
(6th Cir. 2010)....................................................................................57

*Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619 (6th Cir. 2000) ...............52, 53

*Lavin v. Jordan*, 16 S.W.3d 362 (Tenn. 2002) ...........................................25, 26, 28

*Law v. Bioheart, Inc.*, No. 2:07–CV–2177, 2009 WL 693149 (W.D.
Tenn. Mar. 13, 2009) ........................................................................51

*Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612 (6th
Cir. 2010) ..........................................................................................57

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................................32, 34

ix

*Maloney v. T3Media, Inc.*, 94 F. Supp. 3d 1128 (C.D. Cal. 2015)....................52, 53

*Marais v. Chase Home Fin. LLC*, 736 F.3d 711 (6th Cir. 2013)............................16

*Matthews v. Wozencraft*, 15 F.3d 472 (5th Cir. 1994).............................................54

*McKee v. Meltech, Inc.*, No. 10-2730, 2011 WL 1770461 (W.D. Tenn.
    May 9, 2011)...............................................................................................15

*Memphis Dev. Found. v. Factors, Etc. Inc.*, 441 F. Supp. 1323 (W.D.
    Tenn. 1977), *rev'd on other grounds*, 616 F.2d 956 (6th Cir. 1980) ................26

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)........................40, 42

*Montana v. San Jose Mercury News, Inc.*, 40 Cal. Rptr. 2d 639
    (Ct. App. 1995) .........................................................................................21

*Moore v. Univ. of Notre Dame*, 968 F. Supp. 1330 (N.D. Ind. 1997) ....................19

*Moore v. Weinstein Co.*, No. 3:09-00166, 2010 WL 8913520
    (M.D. Tenn. May 12, 2010) ("*Moore I*") ...........................................................16

*Moore v. Weinstein Co.*, No. 3:09-00166, 2012 WL 1884758
    (M.D. Tenn. May 23, 2012) ("*Moore II*") ....................................................16, 25

*Moore v. Weinstein Co.*, 545 F. App'x 405 (6th Cir. 2013)
    ("*Moore III*")...............................................................................................16, 20

*Namath v. Sports Illustrated*, 371 N.Y.S.2d 10 (App. Div. 1975),
    *aff'd*, 352 N.E.2d 397 (N.Y. 1976) ...................................................................21

*Nat'l Exhibition Co. v. Fass*, 143 N.Y.S.2d 767 (Sup. Ct. 1955)...........................30

*Nat'l Football League v. Alley, Inc.*, 624 F. Supp. 6 (S.D. Fla. 1983) ...................18

*NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85 (1984)..................42, 43

*Nichols v. Moore*, 334 F. Supp. 2d 944 (E.D. Mich. 2004).............................45, 54

*NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007) (en banc).........................36

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998)................................................36

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955 (N.D. Cal. 2014) ("*O'Bannon III*") ...................................................24, 34, 37

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049 (9th Cir. 2015) ("*O'Bannon IV*") ...............................................................passim

*Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003)...................................50, 56

*People v. Fogelson*, 577 P.2d 677 (Cal. 1978) ........................................46

*Pirone v. MacMillan, Inc.*, 894 F.2d 579 (2d Cir. 1990)........................................49

*Pittsburgh Athletic Co. v. KQV Broad. Co.*, 24 F. Supp. 490 (W.D. Pa. 1938) ........................................................................30

*Polygram Records, Inc. v. Legacy Entm't Grp., LLC*, 205 S.W.3d 439 (Tenn. Ct. App. 2006) ...............................................................19, 20

*Post Newsweek Stations-Conn., Inc. v. Travelers Ins. Co.*, 510 F. Supp. 81 (D. Conn. 1981)...................................................30, 56

*Ray v. ESPN, Inc.*, 783 F.3d 1140 (8th Cir. 2015)....................................................52

*Read v. Lifeweaver, LLC*, No. 2:08-CV-116, 2010 WL 1798704 (E.D. Tenn. May 5, 2010)...............................................................15

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) ......................................57

*Rogers v. Grimaldi*, 695 F. Supp. 112 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 994 (2d Cir. 1989) ...............................................................45

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989)...........................................passim

*Rolling Stone v. Stewart LLC*, 105 Cal. Rptr. 3d 98 (Ct. App. 2011) ......... 21-22, 23

*Rooney v. Columbia Pictures Indus., Inc.*, 538 F. Supp. 211 (S.D.N.Y.), *aff'd*, 714 F.2d 117 (2d Cir. 1982) ....................................................33

*Ruffin-Steinback v. dePasse*, 267 F.3d 457 (6th Cir. 2001).............................. 18-19

*Ruffin-Steinback v. dePasse*, 82 F. Supp. 2d 723 (E.D. Mich. 2000), *aff'd*, 267 F.3d 457 (6th Cir. 2001)...................................................20

*Schivarelli v. CBS, Inc.*, 776 N.E.2d 693 (Ill. App. Ct. 2002)................................21

xi

*Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996) ............................19

*Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108 (6th Cir. 1995) ........................................46

*SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351 (6th Cir. 2014) ....................58

*Shepherd v. Wellman*, 313 F.3d 963 (6th Cir. 2002) ...............................................57

*Smith v. NCAA*, 139 F.3d 180 (3rd Cir. 1998), *vacated on other grounds*, 525 U.S. 459 (1999) ...................................................................43

*Somerson v. McMahon*, 956 F. Supp. 2d 1345 (N.D. Ga. 2012) ...........................52

*Somerson v. World Wrestling Entm't, Inc.*, 956 F. Supp. 2d 1360 (N.D. Ga. 2013) ...................................................................................19

*Square D Co. v. Niagara Frontier Tariff Bur., Inc.*, 476 U.S. 409 (1986) ...........................................................................................................33

*Stromback v. New Line Cinema*, 384 F.3d 283 (6th Cir. 2004) ..............................52

*Taubman Co. v. Webfeats*, 319 F.3d 770 (6th Cir. 2003) ........................................44

*Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376 (6th Cir. 1993) ..............................................................................58

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430 (6th Cir. 2008) ..................................................13, 32, 41

*Twentieth Century Sporting Club v. Transradio Press Serv.*, 300 N.Y.S. 159 (Sup. Ct. 1937) ...............................................................................30

*United States v. Denkins*, 367 F.3d 537 (6th Cir. 2004) .........................................14

*Washington v. Smith*, 893 F. Supp. 60 (D.D.C. 1995), *aff'd*, 80 F.3d 555 (D.C. Cir. 1996) ...................................................................................19

*Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565 (6th Cir. 2008)............57, 58

*Wis. Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614 (7th Cir. 2011) ("*WIAA*") ...........................................................................30, 56

*Zacchini v. Scripps-Howard Broad Co.*, 433 U.S. 562 (1977)....................54, 55, 56

**Statutes & Rules**

17 U.S.C. § 102(a) ............................................................52

17 U.S.C. § 301 .................................................................52

Fed. R. Civ. P. 12(b)(6).................................................8, 13

Lanham Act Section 43, 15 U.S.C. § 1125........................passim

Sherman Act Section 1, 15 U.S.C. § 1 ..............................passim

Tenn. Code Ann. § 47-25-1101 ...........................................13

Tenn. Code Ann. § 47-25-1105 .......................................passim

Tenn. Code Ann. § 47-25-1106 ............................................28

Tenn. Code Ann. § 47-25-1107 .......................................passim

U.S. Const. amend. 1......................................................passim

## CITATION FORMS

| Citation Form | Description | Date Filed |
|---|---|---|
| RE# | Record Entry Number from the District Court Docket No. 3:14-01945 | |
| Compl. | Plaintiffs' Complaint, RE001 | 10/03/14 |
| Motions to Dismiss | Motions to Dismiss of Conference Defendants, RE214; Licensing Defendants, RE218; and Network Defendants, RE220 | 12/10/14 |
| ND Br. | Memorandum in Support of Network Defendants' Motion to Dismiss, RE221 | 12/10/14 |
| Motion to Stay | Motion to Stay Discovery Pending the Resolution of Defendants' Motions to Dismiss, RE224 | 12/10/14 |
| Stay Order | Order Granting Motion to Stay Discovery, RE255 | 02/05/15 |
| Opp'n Br. | Plaintiffs' Response to the Network Defendants' Motion to Dismiss, RE257 | 02/13/15 |
| ND Reply | Reply Memorandum in Support of Network Defendants' Motion to Dismiss, RE269 | 03/06/15 |
| MTD Order | Order Dismissing Complaint with Prejudice, RE285 | 06/04/15 |
| Memorandum | Chief Judge Kevin H. Sharp's Memorandum in Support of Order Dismissing Complaint with Prejudice, RE288 | 06/08/15 |
| Br. | Brief of Plaintiffs-Appellants | 10/09/15 |

## STATEMENT REGARDING ORAL ARGUMENT

The Network Defendants respectfully request oral argument so that they may (i) further explain the legal deficiencies in Plaintiffs' Complaint; (ii) address any questions the Court might have; and (iii) respond to the arguments made in Plaintiffs' reply brief.

## INTRODUCTION

Plaintiffs are ten former college athletes who played basketball or football at an NCAA Division I school knowing that games in which they played would be televised and that NCAA rules allowed only amateur players to participate in the games.  Plaintiffs now complain that arrangement was unlawful. The fundamental premise of all their claims is that college basketball and football players have rights of publicity in sports broadcasts under Tennessee law, and, therefore, the class of college basketball and football players they seek to represent should be compensated because their names, images, or likenesses appeared on sports broadcasts.  Plaintiffs' claims are incurably flawed.

As the district court correctly recognized, Plaintiffs' asserted right of publicity in sports broadcasts—the cornerstone of all their claims—does not exist under Tennessee law, which expressly provides that participants in sporting events have no rights of publicity in the broadcasts of those events.  So does the law of every other state to address the issue.  That is not surprising; a contrary rule would mean chaos for sports broadcasting.  Under Plaintiffs' theory, not only would broadcasters have to obtain the consent of every athlete before every broadcast, but they also would have to obtain the consent of anyone else who might appear on the broadcast, including coaches, referees, cheerleaders, and musicians.  That is not the law; no court has recognized the rights of publicity that Plaintiffs assert, including

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049 (9th Cir. 2015)—a case that Plaintiffs repeatedly cite but that actually further undermines their claims. (Section I.)

As the district court also correctly found, Plaintiffs cannot bring any claim, under any theory, premised on publicity rights they do not have. For instance, Plaintiffs cannot allege antitrust injury (or even injury in fact) because their only purported injury is based on asserted rights of publicity that do not exist. Plaintiffs' antitrust claim is legally deficient for additional reasons, including the failure to allege harm to competition. The Network Defendants are merely alleged to have purchased broadcast rights from the producers of college sports games. They are *not* alleged to have had any connection with (let alone control over) the NCAA's amateurism rules, which are the sole source of the compensation restrictions Plaintiffs seek to undo, but which predate even the advent of national television broadcasting. The Supreme Court of the United States has described the NCAA's amateurism rules as pro-competitive, and this Court has held those same rules to be noncommercial and, thus, not subject to antitrust scrutiny. (Section II.)

The district court also correctly dismissed Plaintiffs' Lanham Act claim both because (i) the Lanham Act does not apply to *non*commercial speech, such as sports broadcasts and related advertisements; and (ii) Plaintiffs do not allege any facts suggesting false endorsement. (Section III.)

None of Plaintiffs' scattershot legal theories—statutory right of publicity; common law right of publicity; Sherman Act; Lanham Act; accounting; civil conspiracy; or unjust enrichment—can overcome those and other fundamental defects.  The district court's decision should be affirmed.

## STATEMENT OF THE ISSUES

1.  Did the district court correctly dismiss Plaintiffs' Tennessee Personal Rights Protection Act ("TPRPA") claims, considering that the TPRPA expressly permits the use of a person's name, photograph, or likeness "if the use of [that] name, photograph, or likeness is in connection with any news, public affairs, or sports broadcast or account"?  Tenn. Code Ann. § 47-25-1107(a).

2.  Did the district court correctly dismiss Plaintiffs' common law right of publicity claims, considering that no court in Tennessee—or elsewhere—has recognized a common law right of publicity for participants in sports broadcasts?

3.  Did the district court correctly dismiss Plaintiffs' Sherman Act claims, considering that (i) there cannot be an antitrust violation concerning rights of publicity that do not exist; (ii) Plaintiffs do not plead harm to competition; and (iii) Plaintiffs do not plead any agreement to achieve an unlawful purpose?

4.    Did the district court correctly dismiss Plaintiffs' Lanham Act claims, considering that (i) the Lanham Act applies only to commercial speech (and not to the *non*commercial speech at issue here); and (ii) Plaintiffs failed to plead facts suggesting that student athletes' names or images were used to falsely endorse network programming?

5.    Did the district court correctly dismiss Plaintiffs' claims for accounting, unjust enrichment, and civil conspiracy, considering that those claims are based entirely upon Plaintiffs' deficient right of publicity and antitrust claims?

6.    Did the district court properly exercise its discretion to dismiss the Complaint with prejudice, considering that (i) Plaintiffs failed to seek leave to amend and (ii) any such amendment would have been futile?

## STATEMENT OF THE CASE

## I.    PLAINTIFFS' COMPLAINT.

### A.    The Parties.

1.    <u>Plaintiffs.</u>

Plaintiffs are ten former NCAA football and basketball players. (RE001, Compl., PID#5-9, ¶¶11-20.)  Plaintiffs purport to represent a class of "all other current and former players at the Football Bowl Subdivision ('FBS') and

NCAA Division I Men's basketball level." (*Id.* PID#2.)[1]

    2.   <u>Defendants.</u>

There are 27 Defendants, which the Complaint groups into three categories: (i) the "Broadcast" Defendants (referred to herein as Network Defendants); (ii) the Conference Defendants; and (iii) the Licensing Defendants. (*Id.* PID#9-17, ¶¶21-75.) Each of the Network Defendants individually purchases media content, including collegiate sports, or produces it internally, and then telecasts that content to television viewers. (*Id.* PID#9-11, ¶¶21-35.) The Conference Defendants manage athletic competition among teams and sell the rights to broadcast conference games to the Network Defendants, or other networks, including those with which they are affiliated. (*Id.* PID#11-12, 24-25, ¶¶36-43, 113.) The Licensing Defendants allegedly "offer their collegiate partners services in brand management and brand development . . . [purportedly] act[ing] as a conduit in licensing college teams' intellectual property." (*Id.* PID#26, ¶122.)

## B.   **The NCAA's Amateurism Rules.**

The NCAA is an unincorporated association of colleges, universities, and athletic conferences throughout the United States. (*Id.* PID#17, ¶76.) Since the NCAA's founding in 1906, amateurism has been a key condition of participation in

---

[1] On a motion to dismiss, "a named plaintiff must have a valid cause of action . . . , and cannot rely on the allegations of putative class members if he or she does not also have a claim . . . ." *Crissen v. Gupta*, 994 F. Supp. 2d 937, 946 (S.D. Ind. 2014).

NCAA activities. (*Id.* PID#20, ¶¶91, 93, 95.) The NCAA Constitution provides that the fundamental purpose of the NCAA is to maintain "the athlete as an integral part of the education program and the athlete as [a] part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports." (*Id.* PID#21, ¶97.) To ensure that participants in NCAA sports remain amateurs, the NCAA rules provide various guidelines for when an athlete may lose eligibility for receiving compensation for his or her athletic performance. (*Id.* PID#21-22, ¶99.)

Plaintiffs do not allege that the Network Defendants had any role in formulating, influencing, or enforcing the NCAA's amateurism rules. (*Id.* PID#22-23, ¶¶102-103.) To the contrary, those rules have been in place since 1906, well before college sports were televised (indeed, before the advent of television itself). (*Id.* PID#20, ¶¶91-95.)

## C. The Broadcast of NCAA Football and Basketball Games.

The Network Defendants broadcast college football and basketball games. (*Id.* PID#23, ¶¶105-107.) Each of the Network Defendants individually enters into programming agreements with conferences, schools, and the NCAA; the programming agreements specify which networks are entitled to broadcast which games. (*Id.* PID#24-25, ¶113.)

The Complaint nowhere alleges any agreement between or among any

of the Network Defendants.  In fact, those Defendants compete fiercely to acquire and televise sports programming.  The Complaint accurately alleges that as a result of that competition the Network Defendants pay billions of dollars each year to the conferences, schools, and the NCAA for broadcast rights specified in their separately negotiated programming agreements.  (*Id.*)  The Complaint does not allege that the programming agreements limit what the Conference Defendants, their member schools, or the NCAA can do with the funds paid to them by the Network Defendants (they do not), nor is there any allegation that the programming agreements are conditioned upon the continued application of the NCAA amateurism rules (they are not).  (*Id.*)  There also is no allegation in the Complaint concerning any rebroadcast of any game featuring any named Plaintiff.  (*Id.*)

According to the Complaint, Plaintiffs each agreed to play for their respective NCAA teams, some accepting scholarships to play (*id.* PID#25, 26, ¶¶114, 116), at a time when the NCAA's amateurism rules had been in effect for nearly a century (*id.* PID#20-22, ¶¶93-99).  Each Plaintiff clearly understood that some of his games would be broadcast.  (*Id.* PID#28, ¶¶132-133.)  Plaintiffs now take issue with NCAA rules that prohibit certain compensation to student athletes.  (*Id.* PID#2 at Introduction.)

## II.    DEFENDANTS' MOTIONS TO DISMISS AND PLAINTIFFS' OPPOSITION.

Defendants moved to dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).  (RE214, 218, 220, Motions to Dismiss, PID#769-81, 829-37, 856-68.)  The Network Defendants argued, among other things, that Plaintiffs' purported publicity rights in sports broadcasts were expressly exempted from the scope of the TPRPA, that no court has recognized common law publicity rights for participants in team sporting events, and that there cannot be an antitrust claim concerning non-existent rights.  (RE221, ND Br., PID#869-931.)

Plaintiffs opposed Defendants' motions.  (RE257, Opp'n Br., PID#1874-923.)  In their Opposition, Plaintiffs abandoned two of the Complaint's fundamental claims in favor of new (equally implausible) theories:

- *First*, Plaintiffs argued that the TPRPA is *unconstitutional* because "[b]ut for the [TPRPA's] sports broadcast exception, Plaintiffs would be able to assert a cause of action under the TPRPA." (RE257, Opp'n Br., PID#1886.)

- *Second*, after repeated emphasis on the NCAA amateurism rules in their Complaint (RE001, Compl., PID#20, ¶¶94-95), Plaintiffs argued in their Opposition that "the [NCAA] amateurism rules that

8

preclude Student Athlete compensation are not the restraint at issue." (RE257, Opp'n Br., PID#1906.)

The Network Defendants addressed Plaintiffs' new—and deficient—theories in their Reply Brief. (RE269, ND Reply, PID#2267-305.)

## III. THE DISTRICT COURT'S DECISION.

The district court held oral argument on April 13, 2015, and on June 4, 2015, entered an Order granting Defendants' motions to dismiss in their entirety and with prejudice (RE285, MTD Order, PID#2660); the Memorandum corrected a typographical error on June 8, 2015 (RE288, Memorandum, PID#2663-95).

The district court held that the TPRPA expressly bars Plaintiffs' statutory right of publicity claims. (*Id.* PID#2676-77.) It also declined Plaintiffs' invitation to create a new common law right of publicity, noting that Plaintiffs could cite "no case from any court in Tennessee that recognizes a right to publicity in sports broadcasts." (*Id.* PID#2671.)

The district court dismissed Plaintiffs' Sherman Act claim for three independently sufficient reasons: first, the NCAA amateurism rules do not violate the Sherman Act (*Id.* PID#2684-87); second, absent rights of publicity, Plaintiffs could not have suffered an injury in fact (*Id.* PID#2688-89); and, third, Plaintiffs failed to plead any harm to competition (*Id.* PID#2689-90).

The district court dismissed Plaintiffs' Lanham Act claim on two independent grounds, holding: first, that the Act does not apply to noncommercial speech, such as sports broadcasts and related advertisements (*Id.* PID#2691-92); and, second, that Plaintiffs did not plead false endorsement, having failed to explain how viewers could be confused by Plaintiffs' appearances during live-game broadcasts. (*Id.* PID#2692-93.)

As a consequence of dismissing Plaintiffs' rights of publicity, Sherman Act, and Lanham Act claims, the district court dismissed the remaining tag-along state law claims. (*Id.* PID#2693.)

## SUMMARY OF THE ARGUMENT

The district court's judgment should be affirmed in its entirety because each of Plaintiffs' claims fails as a matter of law.

***Right of Publicity*.** The district court correctly held that Plaintiffs have no publicity rights in sports broadcasts or related advertisements. In the district court, Plaintiffs never even attempted to argue that they could sue under the TPRPA, going so far as to claim that the TPRPA is unconstitutional because it does not provide student athletes a cause of action. (RE257, Opp'n Br., PID#1885-87.) Their attempt to reverse course (again) on appeal fails. The TPRPA applies only to the use of a name, image, or likeness for purposes of "advertising[,] . . . fund raising, solicitation of donations, purchases of products, merchandise, goods,

10

or services." Tenn. Code Ann. § 47-25-1105(a). It does not apply to broadcasts, and even with respect to the limited uses it covers, it expressly permits the use of names, images, and likenesses "in connection with . . . sports broadcasts." *Id.* § 47-25-1107(a). Likewise, Tennessee common law, which is coextensive with the TPRPA, does not confer rights of publicity on participants in sports broadcasts. Plaintiffs can point to no case that recognizes such rights. Plaintiffs tacitly concede this point, arguing that the common law should "evolve" to create in Tennessee a *new* common law right of publicity for sports broadcasts that exists nowhere else. But Tennessee law flatly prohibits the creation of new common law rights that would conflict with Tennessee statutes, and Plaintiffs' envisioned right of publicity would directly conflict with the TPRPA, which restricts right of publicity claims to advertising about items *other than* news and sports. (Section I.)

   ***Antitrust Claims.*** The district court correctly held that Plaintiffs failed to plead a Sherman Act claim. Plaintiffs allege no plausible injury in fact because they have no right to be compensated for appearing in sports broadcasts and, thus, have suffered no legally cognizable harm due to not receiving such compensation. Plaintiffs also allege no *antitrust* injury because they do not allege harm *to competition*. Finally, the Complaint cannot plausibly allege that the Network Defendants' agreements to purchase broadcasting rights had the unlawful purpose of restricting student-athlete compensation. (Section II.)

***Lanham Act Claim.***  Plaintiffs' Lanham Act claim fails for two independent reasons identified by the district court.  *First*, the Lanham Act applies only to commercial speech, and sports broadcasts and related advertisements are *not* commercial speech.  *Second*, Plaintiffs do not plausibly allege false endorsement in connection with the student athletes' names and images.  Plaintiffs' Lanham Act claim also fails because the *Rogers* test bars it.  (Section III.)

***Other State Law Claims.***  Plaintiffs do not dispute the district court's holding that their claims for accounting, civil conspiracy, and unjust enrichment must be dismissed if their right of publicity, Sherman Act, and Lanham Act claims are dismissed.  (Br. 55.) (Section IV.)

***Copyright Preemption and First Amendment Bar.***  The Copyright Act and the First Amendment of the United States and Tennessee constitutions provide alternative bases for dismissing Plaintiffs' claims.  (Section V.)

***Dismissal with Prejudice.***  The district court acted within its discretion in dismissing the Complaint with prejudice.  Plaintiffs never filed a motion to amend their Complaint, and any amendment would be futile because Plaintiffs' claims are legally and incurably flawed.  (Section VI.)

## STANDARD OF REVIEW

"Whether a district court properly dismissed a suit pursuant to Rule 12(b)(6) is a question of law subject to de novo review." *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007).

The district court correctly applied the standards set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) (RE288, Memorandum, PID#2669), and "presumed to be true" all the Complaint's well-pleaded factual allegations. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008).

## ARGUMENT

## I.     THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' RIGHT OF PUBLICITY CLAIMS.

Plaintiffs claim they have a right under Tennessee law to be paid whenever their names are mentioned or their images are shown during televised sports broadcasts or related advertisements.  The district court correctly held that Plaintiffs do not have any such right.  The statute Plaintiffs invoke expressly *precludes* a right of publicity in "sports broadcast[s]" or related advertisements, and Tennessee common law creates no broader right.

### A.     The District Court Correctly Dismissed Plaintiffs' Claim Under the Tennessee Personal Rights Protection Act.

The Complaint asserts a claim under Tennessee's statutory right of publicity (the TPRPA), Tenn. Code Ann. § 47-25-1101 *et seq.*  After Defendants'

motions to dismiss identified fatal flaws in Plaintiffs' TPRPA claim, Plaintiffs abruptly reversed course, arguing that the TPRPA—the very statute they chose to invoke—was unconstitutional because it violated "the Equal Protection rights guaranteed by both the Tennessee and United States Constitutions."  (RE257, Opp'n, PID#1885-87.)[2]  Plaintiffs also offered no response to Defendants' showing that their TPRPA claim fails.  (*Id.* PID#1875.)  Thus, Plaintiffs' statutory claim is waived and cannot be asserted on appeal.  *United States v. Denkins*, 367 F.3d 537, 542-43 (6th Cir. 2004).

Even if it were preserved, Plaintiffs would have no viable TPRPA claim.  The TPRPA is a narrow law.  *Apple Corps Ltd. v. A.D.P.R.*, 843 F. Supp. 342, 347 (M.D. Tenn. 1993) ("the [TPRPA] is narrowly drawn").  The TPRPA does not confer any publicity rights on participants in sports broadcasts or, for that matter, any other type of broadcast.  Rather, as Plaintiffs concede (Br. 13), the TPRPA "proscrib[es] only the unauthorized use of another's name or likeness *in advertising*."  *Apple Corps*, 843 F. Supp. at 347 (emphasis added); Tenn. Code Ann. § 47-25-1105(a); *see also Clark v. Viacom Int'l, Inc.*, No. 3:12-0675, 2014 WL 1934028, at *15-16 (M.D. Tenn. May 13, 2014) (dismissing TPRPA claim because plaintiff failed to allege a use in connection with any advertisement), *aff'd*,

---

[2] The district court soundly rejected Plaintiffs' constitutional challenges to the TPRPA (RE288, Memorandum, PID#2679-82), a decision not challenged on appeal.

617 F. App'x 495 (6th Cir. 2015);  *Read v. Lifeweaver, LLC*, No. 2:08-CV-116,

2010 WL 1798704, at *10-11 (E.D. Tenn. May 5, 2010) (same); *McKee v.*

*Meltech, Inc.*, No. 10-2730, 2011 WL 1770461, at *12 (W.D. Tenn. May 9, 2011)

(same); *Gauck v. Karamian*, 805 F. Supp. 2d 495, 502 n.7 (W.D. Tenn. 2011)

(same).

      Even within the narrow realm of the advertising that it does cover, the

TPRPA provides that "[i]t is deemed a fair use and no violation of an individual's

rights shall be found . . . if the use of a name, photograph, or likeness is *in*

*connection with* any news, public affairs, or *sports broadcast or account*."  Tenn.

Code Ann. § 47-25-1107(a) (emphasis added).  As the district court held, that

provision squarely forecloses Plaintiffs' statutory claim.  (RE288, Memorandum,

PID#2676-77.)  Other courts have granted motions to dismiss based on similar

statutes.  *See Cummings v. ESPN Classic, Inc.*, No. 08-cv-0718, 2009 WL 650559,

at *2 (S.D. Ill. Mar. 9, 2009) (dismissing Illinois statutory right of publicity claim

based on "sports broadcast" exemption); *Baugh v. CBS, Inc.*, 828 F. Supp. 745,

754 (N.D. Cal. 1993) (dismissing California statutory misappropriation of likeness

claim based on "news or public affairs" exemption).

      Plaintiffs now argue that this statutory exemption is "not absolute,"

but rather presents "a mixed question of law and fact."  (Br. 27-28.)  But the

TPRPA's exemption is explicitly absolute; it provides that "it *is* deemed a fair use,

and no violation of an individual's rights *shall* be found."  Tenn. Code Ann. § 47-25-1107(a) (emphasis added).  Notably, Plaintiffs identify no salient "facts" in dispute.  Nor could they; the broadcasts at issue indisputably are "sports broadcasts" under the TPRPA.  Plaintiffs never analyze the wording of the statute at all.  Instead, they rely on inapposite cases that are not about sports broadcasts and do not invoke or interpret the TPRPA's sports broadcast exemption.[3]  Plaintiffs also point to the federal Copyright Act's fair use provision.  But that law provides a multi-factor statutory balancing test that bears no resemblance to the TPRPA's blanket exemption.  (Br. 28.)

A statute that expressly exempts advertisements in connection with sports broadcasts cannot support claims based on advertisements in connection with sports broadcasts, even at the pleading stage.  *Cf. Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 718-19 (6th Cir. 2013) ("[T]he district court properly dismissed the [Truth in Lending Act] claim because . . . [the] TILA expressly exempts servicers from liability.")

---

[3] Plaintiffs cite *Moore v. Weinstein Co.*, No. 3:09-00166, 2010 WL 8913520, at *12 (M.D. Tenn. May 12, 2010) ("*Moore I*").  (Br. 27-28, 44.)  But that case addressed whether "movie-related products"—not sports broadcasts—might violate the TPRPA and, if so, whether such products were protected by the First Amendment.  *Id.*  *Moore* ultimately held that Arizona law applied to the plaintiffs' right of publicity claims, but it also explained that the TPRPA and Tennessee common law are "coextensive."  *Moore v. Weinstein Co.*, No. 3:09-CV-00166, 2012 WL 1884758, at *30 (M.D. Tenn. May 23, 2012) ("*Moore II*"), *aff'd*, 545 F. App'x 405 (6th Cir. 2013) ("*Moore III*").

**B.    The District Court Correctly Dismissed Plaintiffs' Right of Publicity Claim Under Tennessee Common Law.**

Tennessee common law does not recognize rights of publicity in sports broadcasts or related advertisements, and this Court should decline Plaintiffs' invitation to "evolve" that law to be the first court in the nation to create (rather than reject) such rights.  (Br. 32.)  In fact, Tennessee common law *cannot* evolve to grant Plaintiffs the rights they claim because it would conflict with the TPRPA, which would then control under well-settled Tennessee law.  There is nothing in Tennessee's treatment of publicity rights that would support it becoming the lone national outlier on this issue.

1.    No Tennessee Case Has Recognized a Right of Publicity in Sports Broadcasts or Related Advertisements.

Neither below nor here have Plaintiffs cited a single case that recognizes a common law right of publicity in sports broadcasts or related advertisements.  (RE288, Memorandum, PID#2671.)  Plaintiffs tacitly *concede* that Tennessee's common law provides them no cause of action by devoting an entire section of their brief to imploring this Court to "evolve" Tennessee's common law to create such a claim.  (Br. 32.)  The nonexistence of the rights Plaintiffs assert should end the matter.

2.    <u>Tennessee Common Law Should Not Now Recognize a Right
of Publicity in Sports Broadcasts or Related Advertisements.</u>

The district court correctly found that no state has recognized any

right of publicity possessed by anyone in broadcasts of team sports games.

(RE288, Memorandum, PID#2673-74.)  Every jurisdiction to consider that

proposition has squarely rejected it.  *See Dryer v. Nat'l Football League*, 55 F.

Supp. 3d 1181, 1195-200 (D. Minn. 2014) ("*Dryer III*") (Minnesota, New York,

California, and Texas do not recognize publicity rights in broadcasts of NFL game

footage); *Nat'l Football League v. Alley, Inc.*, 624 F. Supp. 6, 10 (S.D. Fla. 1983)

(Miami Dolphins players have no right of publicity in the broadcast of Dolphins

games, which are "presentation[s] having a current or legitimate public interest"

(internal quotation marks omitted)); *Gautier v. Pro-Football, Inc.*, 107 N.E.2d 485,

489 (N.Y. 1952) (rejecting publicity claim by halftime performer at a professional

football game); *see also Balt. Orioles, Inc. v. Major League Baseball Players

Ass'n*, 805 F.2d 663, 679 (7th Cir. 1986) (athletes could not assert rights of

publicity in broadcasts of major league baseball games because the Copyright Act

preempted such claims).

That is not surprising.  The common law generally does not recognize

publicity rights in media programming that relates to matters of public interest.

*See, e.g.*, *Ruffin-Steinback v. dePasse*, 267 F.3d 457, 462 (6th Cir. 2001) (no right

of publicity under Michigan law in television mini-series detailing musical group's

history because it was "a public interest publication"); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 338 (E.D. Pa. 1996) (no right of publicity in film portraying history of Black Panther Party); *Somerson v. World Wrestling Entm't, Inc.*, 956 F. Supp. 2d 1360, 1368 (N.D. Ga. 2013) (no right of publicity under Georgia common law in wrestling website's use of wrestler's image because it was "a matter of public interest and protected by the First Amendment"). And sports programming has long been recognized as a matter of intense public interest.[4]

Tennessee cases have limited publicity rights to their most traditional context—advertisements and celebrity endorsements—and have never applied publicity rights to public interest media of any kind, let alone to sports broadcasts.[5]

---

[4] *See, e.g.*, *Gionfriddo v. Major League Baseball*, 114 Cal. Rptr. 2d 307, 316 (Ct. App. 2001) (use of video clips from games on Major League Baseball's website concerned matters of public interest); *Dora v. Frontline Video, Inc.*, 18 Cal. Rptr. 2d 790, 792 (Ct. App. 1993) (documentary about surfing related to topics of public interest); *see also Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 136 (1967) (plurality opinion) (college football coach was a public figure in view of popular interest in the sport); *Moore v. Univ. of Notre Dame*, 968 F. Supp. 1330, 1337 (N.D. Ind. 1997) ("[I]t is this court's opinion that football, and specifically Notre Dame football is a matter of public interest."); *Washington v. Smith*, 893 F. Supp. 60, 63 (D.D.C. 1995) ("We conclude that the success of the Jayhawks, a major Division I team, is a matter of public concern"), *aff'd*, 80 F.3d 555 (D.C. Cir. 1996); *Chuy v. Phila. Eagles Football Club*, 431 F. Supp. 254, 267 (E.D. Pa. 1977) ("[Interest] in professional football must be deemed an important incident among many incidents, of a society founded upon a high regard for free expression."), *aff'd*, 595 F.2d 1265 (3d Cir. 1979) (en banc).

[5] Plaintiffs contend that *Polygram Records, Inc. v. Legacy Entertainment Group, LLC*, 205 S.W.3d 439 (Tenn. Ct. App. 2006), recognized publicity rights in the recordings of Hank Williams Sr.'s musical "performances," which they

Plaintiffs next assert that their Tennessee common law publicity rights are violated because television networks use game footage to advertise their sports broadcasts, as well as to promote network programming more generally during their sports broadcasts.  But no jurisdiction recognizes that theory either.  Rather, the law sensibly permits media entities to use examples from their programs to advertise those programs or other programs they disseminate.[6]  For example, broadcasters may use highlights from a game to advertise another game, and may use game footage to advertise other sports programs, or to encourage viewers to

---

analogize to the broadcasts of their athletic "performances."  (Br. 14.)  That is incorrect.  *Polygram Records* expressly treated the right to Williams' recorded performances as a property right that was distinct from his "name and likeness" publicity rights.  205 S.W.3d at 442 (explaining that Williams' heirs contended that "they succeeded to Hank Williams' rights in the recordings, and in addition thereto, the rights of publicity in his name and likeness").  To resolve the dispute over the property right in his recorded performances, the court discussed contract and copyright law.  *Id.* at 444-45.  The court had no occasion to decide how the law would treat attempts to exploit Mr. Williams' name and likeness rights, such as for purposes of licensing his music to advertise products.  In any event, the case is inapposite because it does not involve sports broadcasts or related advertisements.

[6] *See, e.g.*, *Moore III*, 545 F. App'x at 409-10 (advertising insert packaged with DVDs and CDs enjoyed same First Amendment protection from right of publicity claim as underlying film); *Ruffin-Steinback*, 82 F. Supp. at 731 (advertisement promoting a television docudrama is immune from right of publicity liability because televised story itself is immune), *aff'd*, 267 F.3d 457 (6th Cir. 2001); *Guglielmi v. Spelling-Goldberg Prods.*, 603 P.2d 454, 462 (Cal. 1979) ("It would be illogical to allow respondents to exhibit the film but effectively preclude any advance discussion or promotion of their lawful enterprise.").

watch its programming more generally.[7]  Those well-settled principles dispose of

Plaintiffs' common law advertising-based allegations.  (Br. 30 (citing RE001,

Compl., PID#35 ¶178).)

    In fact, the law recognizes that for-profit media broadcasters and

publishers *necessarily* interrupt and juxtapose their programs and/or articles with

commercial advertisements.  But the inclusion of advertising in broadcasts (just

like advertisements in magazines) does not mean that individuals whose names or

pictures appear with the broadcast are deemed to be "advertising" the products that

appear in the ads.  *See, e.g.*, *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180,

1184-86 (9th Cir. 2001) (fact that plaintiff's picture appeared in a magazine

containing Ralph Lauren clothing ads does not render the picture an advertisement

for the clothing); *Rolling Stone v. Stewart LLC*, 105 Cal. Rptr. 3d 98, 118 (Ct. App.

2011) (court noted that it found no case in any jurisdiction "in which a magazine's

editorial content has been deemed transformed into commercial speech merely

---

[7] *See, e.g.*, *Schivarelli v. CBS, Inc.*, 776 N.E.2d 693, 701 (Ill. App. Ct. 2002)
(television commercial to promote news station's investigative reporting not
actionable); *Montana v. San Jose Mercury News, Inc.*, 40 Cal. Rptr. 639, 642-43
(Ct. App. 1995) (rejecting misappropriation claim by Joe Montana arising from
newspaper's creation of posters that reproduced newspaper photos depicting
Montana—and resold as special "souvenirs" to promote the paper's sports
coverage); *Namath v. Sports Illustrated*, 371 N.Y.S.2d 10, 11-12 (App. Div. 1975),
*aff'd*, 352 N.E.2d 397 (N.Y. 1976).

because of its proximity to advertisements . . . ").  If the law were otherwise, most for-profit media content would be unlawful.

These common sense principles squarely preclude a claim based on the only specific "advertisement" that Plaintiffs pointed to in the district court—a video clip they identified for the first time during the motion to dismiss hearing and that was never alleged.  During a pause in a basketball game broadcast by CBS, a brief banner announcing an upcoming episode of the CBS drama *CSI* appeared at the bottom of the screen.  (RE288, Memorandum, PID#2692.)  Plaintiffs contend this is an example of "superimpos[ing] advertisements of unrelated products during the telecast of the games," and "that allegation alone is sufficient to withstand dismissal."  (Br. 39-40.)

Plaintiffs are mistaken.  As the cited authorities demonstrate, no jurisdiction's law would hold that an image of a participant in a sports game—be it an athlete, coach, referee, scorekeeper, cheerleader, trainer, or marching band member—is being "appropriated" to sell the products or programs that may also be visible on the screen during the course of a live game.  (*See* RE288, Memorandum, PID#2692-93.)  Indeed, what is being announced on CBS's scrolling banner was not a "product" at all, but simply a later broadcast on CBS.  Even if there were a more direct connection between the game footage and a *CSI* promotion (and there is not), the law is clear that networks are free to encourage their audiences to watch

other programs they offer without opening themselves up to right of publicity claims. *Hoffman*, 255 F.3d at 1184-86; *Rolling Stone*, 105 Cal. Rptr. 3d at 118.

For the same reasons, any claim based on this video clip would fail under the TPRPA. The *CSI* banner does not "use" any athlete's image as "an item in commerce" to "advertise" anything, let alone a "product, good, service or merchandise"—since *CSI* is noncommercial speech, not a "product." Tenn. Code Ann. § 47-25-1105(a).[8]

Plaintiffs' only effort to support the existence of the Tennessee publicity rights they claim is to point to one decision of a California federal court that was not applying Tennessee law. That case was a pre-trial decision from a class action involving college athletes who sued the NCAA (and not any television networks) under antitrust laws. (Br. 33-34 (citing *In re NCAA Student Athlete Name & Likeness Litig.*, 37 F. Supp. 3d 1126 (N.D. Cal. 2014) ("*O'Bannon II*")).) Although no right of publicity claim was asserted in *O'Bannon II*, in the course of addressing pre-trial motions directed at the antitrust claims, the district court stated—without conducting any independent analysis—that Minnesota law was

---

[8] The district court also noted that neither this clip nor any other specific advertisement was pleaded in the Complaint, nor could the clip support any claim by Plaintiffs because none of them played in that game. (RE288, Memorandum, PID#2676, 2692.) That alone justifies disregarding the clip. Further, Plaintiffs' stretch their own Complaint by arguing that two affiliate networks that promote each other (Br. 30, 39) is the same as CBS promoting its own programming on a broadcast it aired after the Complaint was filed.

"unsettled" and might recognize publicity rights in "at least certain kinds of broadcast footage," citing a preliminary motion to dismiss ruling in *Dryer v. Nat'l Football League*, 689 F. Supp. 2d 1113, 1123 (D. Minn. 2010) ("*Dryer I*"). *O'Bannon II*, 37 F. Supp. 3d at 1145.

Plaintiffs' reliance on the *O'Bannon II* opinion fails for at least two reasons.

*First*, the class of plaintiffs in *O'Bannon* (which included these Plaintiffs) expressly recognized that, whatever Minnesota might do, *Tennessee* law would *not* recognize publicity rights in college game broadcasts. *See O'Bannon II*, No. 09-CV-01967-CW, Dkt. No. 971-1 at 20-21 (N.D. Cal. Jan. 23, 2014). The *O'Bannon I* district court agreed. *In re NCAA Student-Athlete Name & Likeness Litig.*, 990 F. Supp. 2d 996, 1005-06 (N.D. Cal. 2013) ("*O'Bannon I*"). And Plaintiffs conspicuously ignore that, when the Ninth Circuit reviewed the *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955 (N.D. Cal. 2014) ("*O'Bannon III*") decision, it expressly stated that it was not addressing publicity rights in television broadcasts. *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1067 (9th Cir. 2015) ("*O'Bannon IV*").

*Second*, two months after the *O'Bannon* trial ended, the *Dryer III* court held that neither the law of Minnesota, nor that of the three other states it considered, would recognize publicity rights in professional football game footage.

24

*Dryer III*, 55 F. Supp. 3d at 1195-97 (granting summary judgment to defendants).

Thus, the sole case that the *O'Bannon II* court relied upon to speculate that one

state *might* recognize rights of publicity in sports broadcasts ultimately revisited

that question in more depth and squarely answered it in the negative. *Id.* at 1195-

97. Plaintiffs do not even mention *Dryer III*'s impact on *O'Bannon*.

> ### 3. Broadening Tennessee Common Law Would Conflict with the TPRPA, and the TPRPA Would Control.

For more than a century, Tennessee law has been that "[w]hen there is

a conflict between the common law and a statute, the provision[s] of the statute

must prevail." *Lavin v. Jordan*, 16 S.W.3d 362, 368 (Tenn. 2002); *Graves v. Ill.*

*Cent. R.R. Co.*, 148 S.W. 239, 242 (Tenn. 1912). Thus, as the district court

correctly recognized, the scope of any common law right of publicity cannot be

construed, and certainly cannot "evolve," in a manner that would conflict with the

TPRPA. (RE288, Memorandum, PID#2671.)

The district court held that Tennessee's common law right of publicity

is "co-extensive" with the TPRPA, "having the same scope or boundaries."

(RE288, Memorandum, PID#2671.) Two other federal district courts in Tennessee

have reached the same conclusion. (*Id.* (citing *Moore II*, 2012 WL 1884758,

at *30; *Gauck*, 805 F. Supp. 2d at 500 n.5).) Plaintiffs cite no case to the contrary.

Instead, Plaintiffs create an elaborate straw-man argument, positing

that (i) the district court held that the TPRPA entirely "abrogated" or "supplanted"

a previously existing common law cause of action; and (ii) such a holding is inconsistent with Tennessee's preemption doctrine set forth in *Guy v. Mutual of Omaha Ins., Co.*, 79 S.W.3d 528 (Tenn. 2002).  (Br. 17-18.)

But the district court did not abrogate or supplant any common law cause of action.  It merely held that the common law cannot *conflict with* the TPRPA.  (RE288, Memorandum, PID#2671.)  As the court in *Crowell* made clear, "the General Assembly . . . has the prerogative to define the scope of [the publicity] right [and] undertook to do so in 1984 when it enacted" the TPRPA. Thus, the common law right of publicity may not "evolve" in a manner that conflicts with the TPRPA.  *Lavin*, 16 S.W.3d at 368.[9]  Abrogation is not the issue.

Once Plaintiffs' abrogation distraction is removed, the applicable conflict analysis can be performed.  *See id.*  If the common law were "expanded" to apply to broadcasts (of any kind), it would directly conflict with the Tennessee legislature's decision to limit the right of publicity to "advertising[,] . . . fund raising, solicitation of donations, purchases of products, merchandise, goods, or services," and not to broadcasts.  Tenn. Code Ann. § 47-25-1105(a).  If the common law right of publicity were "expanded" to include the sports broadcasts or

---

[9] Plaintiffs' citation to *Memphis Development Foundation v. Factors, Etc. Inc.*, 441 F. Supp. 1323 (W.D. Tenn. 1977), *rev'd on other grounds*, 616 F.2d 956, 958 (6th Cir. 1980), is inapposite (Br. 14-15).  That case made no ruling regarding the scope of a right of publicity, but rather held that any such property rights are transferable after a performer's death.  *Id.* at 1330.

advertisements for sports broadcasts at issue here, it would directly conflict with the TPRPA's sports broadcast exemption. *Id.* § 1107(a). In both cases, the statutory language must prevail.[10]

Plaintiffs also misconstrue *Guy*. (Br. 17-19.) *Guy* held that Tennessee's whistleblower statute did not preempt common law whistleblower claims because the scope of the rights that each recognized is complementary, not conflicting. Both permit claims for retaliatory discharge for reporting illegal activity, and the main purpose of the statute was to expand the scope of the common law by permitting claims by public (as opposed to only private) employees. *Id.* at 535-36. *Guy* thus held that, absent express statutory language to the contrary, the *remedies* provided by the statute did not abrogate any additional *remedies* provided by the parallel common law tort with respect to whistleblower claims. *Id.* at 536. *Guy* never suggested that if, for instance, the statute had instead expressly *barred* claims premised on whistleblowing activity, the common law

---

[10] Plaintiffs posit a hypothetical about a country music star whose image is used on "bootlegged/counterfeit merchandise," but supposedly would have no remedy. (Br. 24.) Plaintiffs do not bother to analyze the TPRPA's text or the cases interpreting Tennessee's common law right of publicity to support that conclusion, nor do they address what other remedies might be available under state or federal law, which prohibits knowingly using a counterfeit mark. In any event, the hypothetical has no bearing on this case because it does not involve sports broadcasts, which are expressly exempt from the TPRPA and in which no case has recognized publicity rights at common law.

could have simply ignored that, and allowed such claims to proceed in the face of contrary legislative intent. *Lavin* prohibits such a result. *Lavin*, 16 S.W.3d at 368.

So, too, here. To the extent that there might be differences between the *remedies* provided by the TPRPA and the *remedies* provided by the common law for the same publicity rights violation, the district court's ruling leaves open the possibility that both could be invoked. That conclusion is also entirely consistent with Tenn. Code Ann. § 47-25-1106(e)—which Plaintiffs extensively cite—which provides that "[t]he *remedies* provided for *in this section* are cumulative and shall be in addition to any others provided for by law." (emphasis added). That language simply means that the remedies listed in § 47-25-1106— *i.e.*, the remedies section—are "cumulative."

### C.  There Are No Publicity Rights in Sports Broadcasts or Related Advertisements for Important Policy Reasons.

There are sound practical and policy reasons why no state recognizes a right of publicity in the broadcast of team sporting events and related advertisements. As the district court properly recognized, it is the *producer* of the event, not the individual performers or participants, who possesses the exclusive right to license the broadcast of the event. To hold otherwise would make the broadcast of team sporting events practically impossible.

There are scores or even hundreds of "performers" whose names or images may appear in a football or basketball broadcast, including players,

28

coaches, cheerleaders, referees, marching band members, and other halftime performers.  If every such game "performer" had a right of publicity, then according to Plaintiffs' theory, a prospective broadcaster would have to identify all of them in advance and negotiate with each individual.  If a network like ESPN Classic wanted to rebroadcast a game from 50 years ago, the exercise would be impossible.  It would have to identify, locate, and obtain permission from every individual whose image appears in that 50-year-old footage, including the heirs of those who have died, since publicity rights are often descendible.  Tenn. Code Ann. § 47-25-1105(a).  If even one person or estate refused to grant permission, the ability to broadcast the game would be impaired or destroyed.

Further, the rule that Plaintiffs advocate would invite "hold out" gamesmanship.  There would be extreme temptation to try to be the last player to hold out for vast sums at the expense of their teammates.  *See, e.g.*, *Dryer v. Nat'l Football League*, No. CIV. 09-2182 PAM/AJB, 2013 WL 5888231, at *7 (D. Minn. Nov. 1, 2013) ("*Dryer II*") ("Would a court apportion more value to a team's quarterback, because he stands above the line of scrimmage and is more visible in any game clip?").  Moreover, each individual would be free to try to control the message of the broadcaster—for example, by agreeing to be filmed only if the broadcaster praised his performance.  Those scenarios would also impact the broadcasts (even local cable broadcasts) of all manner of less organized

29

sports and group performances, ranging from Little League baseball games to small-town parades and potentially even activities like school programs. *See, e.g.*, *Wis. Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614, 623 (7th Cir. 2011) ("*WIAA*") (holding that state athletic association could grant an exclusive license to stream high school football games over the Internet and noting that activities like spelling bees were broadcast on the same online channel).

Fortunately, these scenarios do not occur because state laws have long vested the proprietary rights necessary to exclusively license the broadcast of an entire sporting event in the *producer* of that event—generally the organizer or sponsor of the game (for example, the NFL, NBA, or individual NCAA member schools)—not in the participants, even where the participants are not paid by the producer.[11]  Participants, of course, may negotiate with the producer concerning the terms on which they will participate.  But 80 years of broadcasting law flatly reject the notion that individual participants in a team sporting event retain a right

---

[11] *See, e.g.*, *WIAA*, 658 F.3d at 629 (high school football association can exclusively license the streaming of high school football games); *Post Newsweek Stations-Conn., Inc. v. Travelers Ins. Co*., 510 F. Supp. 81, 85-86 (D. Conn. 1981) (skating association can exclusively license World Figure Skating Championships); *KTSP-TAFT Television & Radio Co. v. Ariz. State Lottery Comm'n*, 646 F. Supp. 300, 303 (D. Ariz. 1986) (the state may exclusively license the broadcast of state lottery drawings); *Nat'l Exhibition Co. v. Fass*, 143 N.Y.S.2d 767, 777 (Sup. Ct. 1955); *Pittsburgh Athletic Co. v. KQV Broad. Co.*, 24 F. Supp. 490, 493-94 (W.D. Pa. 1938) (Pittsburgh Pirates have the exclusive right to license who may broadcast Pirates games on the radio); *Twentieth Century Sporting Club v. Transradio Press Serv*., 300 N.Y.S. 159, 162 (Sup. Ct. 1937).

of publicity that can be used to control the inclusion of their name and image in the broadcast.

The Second Circuit recently considered analogous claims in the context of a dispute over motion picture copyrights and applied those very principles to determine that copyright law allocates rights to movies in much the same way that state law treats entertainment events.  In *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 258 (2d Cir. 2015), the director of a short film asserted that he owned a distinct copyright in the film based on his "directorial contributions," and thus could enjoin distribution and performance of the film.  The Second Circuit rejected that theory, holding that "[f]ilmmaking is a collaborative process typically involving artistic contributions from large numbers of people . . . .  If copyright subsisted separately in each of their contributions to the completed film, the copyright in the film itself . . . could be undermined by any number of individual claims."  The policy rationale underpinning *Casa Duse* applies with equal force to the filming and broadcasting of sporting events.

## II.     THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' ANTITRUST CLAIM.

To state a claim under Section 1 of the Sherman Act, a plaintiff must plead sufficient factual matter to show that:  "(1) the defendants contracted, combined or conspired among each other; (2) the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic

markets; (3) the objects of and conduct pursuant to that contract or conspiracy were illegal; and (4) the plaintiff was injured as a proximate result of that conspiracy." *Total Benefits*, 552 F.3d at 436 (internal quotation marks omitted).

### A.    The District Court Correctly Dismissed Plaintiffs' Antitrust Claim Because They Failed To Allege Injury in Fact.

Injury in fact is necessary to standing.  "A plaintiff suffers an 'injury in fact' when his legally protected interest has been invaded."  *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (injury in fact, one of three standing requirements, is defined as "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical" (citations and internal quotation marks omitted)).  In Sherman Act cases, the injury in fact must be "a proximate result of [the] conspiracy."  *Total Benefits*, 552 F.3d at 436.

The sole injury claimed by Plaintiffs is that they have not been compensated for the use of their names and images in televised games.  (RE001, Compl., PID#2-4.)  Plaintiffs' antitrust claim is therefore contingent on the existence of a right to be compensated for the use of their names and images in televised games, such that a deprivation of those rights could constitute an injury. But those rights do not exist.  (*See supra* Section I.)  As a result, the district court correctly held that "Plaintiffs cannot have been injured by a purported conspiracy to deny them the ability to sell non-existent rights."  (RE288, Memorandum,

32

PID#2688-89 (citing *Square D Co. v. Niagara Frontier Tariff Bur., Inc.*, 476 U.S. 409, 416 (1986) ("Injury implies violation of a legal right.")).)  Stated differently, Plaintiffs cannot show that "legally protected interest[s] ha[ve] been invaded"— because their claimed rights of publicity are not, in fact, legally protected.  *Kiser*, 765 F.3d at 607.

A district court in another state considered precisely this issue, and— like the district court below—concluded that there can be no antitrust claim to deprive individuals of payments for non-existent rights of publicity, a conclusion the Second Circuit affirmed.  In *Rooney v. Columbia Pictures Industries, Inc.*, the actor Mickey Rooney brought Sherman Act claims against various movie studios, based on violations of his purported rights of publicity.  538 F. Supp. 211 (S.D.N.Y.), *aff'd*, 714 F.2d 117 (2d Cir. 1982).  In dismissing the antitrust claim, the court held:

> As to the first cause of action alleging a conspiracy since at least 1977 to refuse to deal with Rooney concerning his "publicity rights" in pre-1960 films, it is manifest that, *as Rooney had no such rights in the pre-1960 films, he cannot have suffered any antitrust injury* as the result of any such conspiracy.

*Rooney*, 538 F. Supp. at 230 (emphasis added).  So, too, here.

Plaintiffs argue that even if they do not have definitively established publicity rights in sports broadcasts and advertisements, those rights are at least "uncertain."  (Br. 53.)  But the Tennessee publicity rights Plaintiffs claim are not

33

"uncertain"—they do not exist. Tenn. Code Ann. § 47-25-1107(a); *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 931 (6th Cir. 2003). Plaintiffs rely on *O'Bannon III* to argue that college athletes could be injured by the inability to bargain for "uncertain rights," citing purported broadcast agreements allegedly at issue in *O'Bannon*. (Br. 53 (citing *O'Bannon III*, 7 F. Supp. 3d at 994).) But the *O'Bannon* plaintiffs themselves *conceded* that Tennessee "explicitly exempt[s] sports broadcasting" from its right of publicity cause of action. (*O'Bannon II*, No. 09-CV-01967-CW, Dkt. No. 971-1 at 20-21 (N.D. Cal. Jan. 23, 2014).) And the *O'Bannon I* district court recognized that where a state statute explicitly exempts sports broadcasts, student-athletes would have "no right of publicity." 990 F. Supp. 2d at 1005-06. And again, the Ninth Circuit expressly declined to address rights of publicity as applied to participants in live TV broadcasts. *O'Bannon IV*, 802 F.3d at 1067. Thus, the *O'Bannon* decisions that Plaintiffs cite actually confirm that their claimed rights do not exist.[12]

---

[12] Plaintiffs also offer no cogent explanation for how the broadcast agreements they cite could create legal rights that no court has recognized, or how they restrict student athletes from being paid; the conferences and schools unilaterally impose and enforce the pay restrictions—they "do[] not need the acquiescence" of the Networks. *See Int'l Logistics Grp. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989) (no vertical conspiracy where acquiescence of distributors was not essential to manufacturer's actions). Even if Plaintiffs' purported rights could rise to the level of "uncertain," the *O'Bannon III* district court was wrong to suggest that an antitrust plaintiff has standing when deprived of uncertain rights. *See* 7 F. Supp. 3d at 994. Standing requires "an invasion of a legally protected interest" that is "concrete and particularized." *Lujan*, 504 U.S. at 560. "Uncertain" rights cannot

Finally, even if Plaintiffs adequately pleaded an injury in fact, they did not, and cannot, plead that such injury was caused by the Network Defendants. Plaintiffs fail to meaningfully distinguish the authority relied upon by the district court. (RE288, Memorandum, PID#2688-90 (citing *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 792 (8th Cir. 2006)).) In *Canadian Import*, the Eighth Circuit upheld the dismissal of an antitrust complaint brought by consumers against drug manufacturers where the purported injury (higher drug prices) was caused by the government's prohibition on importing Canadian drugs, *not* the conduct of the defendants. 470 F.3d at 792. Plaintiffs misconstrue the holding from *Canadian Import* as being dependent on government activity. (Br. 54.) Government involvement was not the point. Rather, *Canadian Import* holds that if a plaintiff cannot plausibly allege that the defendants' conduct was the cause of plaintiff's purported injury, then plaintiff has no standing to bring an antitrust claim. *Id.* at 791.

The alleged harm to Plaintiffs here—not being compensated for the use of their names and images—cannot plausibly be attributed to the Network Defendants. Rather, any conceivable "harm" that Plaintiffs have suffered is due to

---

satisfy that standard. *Cf. Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540-41 (1983) (holding that a union's "unspecified injuries in its 'business activities'" were an insufficient injury to support antitrust standing).

(i) the nonexistence of the rights of publicity they assert and (ii) the NCAA amateurism rules, with which the Network Defendants have no alleged involvement or control.

### B. The District Court Correctly Dismissed Plaintiffs' Antitrust Claim Because They Failed To Allege Any Antitrust Injury.

Plaintiffs must also adequately allege that any purported injury is of the type Section 1 of the Sherman Act is designed to protect—namely, harm to competition. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (plaintiff alleging a Section 1 vertical agreement "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself"). Plaintiffs must also plead that the Network Defendants' conduct was a "but for" cause of that purported antitrust injury. *See Bassett v. NCAA*, 528 F.3d 426, 434 (6th Cir. 2008).

Plaintiffs focus exclusively on purported harms to their own financial interests, but they do not allege how *competition* has been harmed. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962) (antitrust law protects "competition, not competitors"); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450-51 (6th Cir. 2007) (en banc).[13]

---

[13] Plaintiffs focus much attention on the supposed inequities of compensation limited to the cost of attendance ("COA") compared to the "revenue generated" by the sports broadcasts at issue. (Br. 48.) But even the Ninth Circuit in *O'Bannon IV* explicitly rejected any payments to student athletes beyond the COA and

The district court rightly noted that "[u]ndoubtedly, there is stiff competition among the conferences to secure air time for games, among the networks to broadcast those games, and among the licensors to market college games, *and* Plaintiffs' allegations suggest[] as much."  (RE288, Memorandum, PID#2689-90 (emphasis added).)

Even the *O'Bannon III* district court concluded there could be no injury to competition in the live-game, television-licensing market, holding:

> Plaintiffs have not presented any evidence to show that, in the absence of the challenged restraint, teams of student-athletes would actually compete against one another to sell their group licenses. . . . Allowing student-athletes to seek compensation for group licenses would not increase the number of television networks in the market or otherwise enhance competition among them.

7 F. Supp. 3d at 995-96.  The *O'Bannon III* district court also recognized that "the television networks [] already compete freely against one another".  *Id.* at 996. The court's reasoning applies with even greater force to the implausible "individual licensing" market Plaintiffs envision here.  (RE001, Compl., PID#28, ¶131.)

Moreover, the Network Defendants could not be the "but for" cause of any antitrust injury.  Even if Plaintiffs had sought to license their purported

---

"untethered to educational expenses" due to the pro-competitive benefits of the NCAA amateurism rules.  *See O'Bannon IV*, 802 F.3d at 1076.

publicity rights to the Networks, and even if the Networks had agreed to purchase those rights, Plaintiffs would have been left in the same position.  That is because, as Plaintiffs concede, the NCAA would have ruled the Plaintiffs ineligible to play the moment they agreed to sell their purported rights.  (*Id.* PID#21, ¶¶98-99); Br. 47 ("[T]he amateurism rules prohibit negotiation directly with student-athletes.").)  As a consequence, Plaintiffs would never have appeared in an NCAA broadcast; they would never have earned a cent from their purported rights of publicity; and "competition" (however defined) would have been unchanged.  *Canadian Imp.*, 470 F.3d at 792.[14]

### C.     Plaintiffs Cannot Plausibly Allege That the Network Defendants Entered into an Agreement To Achieve an Unlawful Purpose.

Plaintiffs' Section 1 claim against the Network Defendants also fails because they cannot allege any anticompetitive agreement to which any Network Defendant is a party.  At the very least, the Complaint must identify the *who, what, where, and when* of the purported agreement.  *See Twombly*, 550 U.S. at 556-57 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").  At the pleading stage, this requires

---

[14] Contrary to Plaintiffs' assertion, the district court did not dismiss Plaintiffs' claims for failure to add the NCAA as a defendant; rather, the district court simply pointed out that the NCAA rules provide a necessary backdrop for Plaintiffs' claims.  (*See, e.g.*, RE288, Memorandum, PID#2666-69, 2688-90.)

"enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.

Plaintiffs offer only vague and conclusory assertions of an unlawful agreement. Although the district court did not explicitly dismiss Plaintiffs' antitrust claims for failure to plead any unlawful agreement, it did single out the Network Defendants as being particularly detached from any purported anticompetitive behavior: "Plaintiffs fail to show how Defendants' behavior (*most particularly that of Network and Broadcast Defendants*), in complying with NCAA rules, can be said to be the cause of reduced competition and any concomitant antitrust injury." (RE288, Memorandum, PID#2690 (emphasis added).)

Plaintiffs cannot allege a single direct link connecting the Network Defendants with the NCAA's amateurism rules. Instead, they vaguely assert that the Network Defendants indirectly caused Plaintiffs' injury by negotiating with the conferences and licensing entities.[15] (RE001, Compl., PID#24-26, ¶¶110-115.) But they do not explain how the Network Defendants' longstanding practice of purchasing broadcast rights from producers could violate the Sherman Act. It is simply not plausible to suggest that the Network Defendants—in negotiating

---

[15] Plaintiffs fail even to allege any link between Defendant NBC and any Plaintiff. NBC is alleged to be a party solely to an agreement for "exclusive national coverage of all University of Notre Dame home football games" (RE001, Compl., PID#11, ¶31), and no Plaintiff is alleged to have played for or against Notre Dame.

fiercely to secure competitive, multi-billion-dollar TV deals (*id.*)—are colluding to

harm competition in the non-existent market for student-athlete publicity rights.[16]

> 1.    Plaintiffs Cannot Plausibly Allege That the Broadcast
> Agreements Are Intended To Achieve an Unlawful Objective.

Plaintiffs identify only one form of agreement to which any Network

Defendant has ever been a party:  the separate vertical programming contracts

between each of the Network Defendants individually, on one side; and the

NCAA, Conference Defendants or schools, on the other (the "Broadcast

Agreements").  (RE001, Compl., PID#23-26, ¶¶105-119.)  For a vertical

agreement of this type to violate antitrust law, it must reflect "a conscious

commitment to a common scheme designed to achieve an unlawful objective."

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *Kendall v. Visa*

*U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).

Plaintiffs fail to plausibly attribute any unlawful purpose to the

Broadcast Agreements.  Those contracts have a necessary, obvious, and lawful

purpose that has nothing to do with the NCAA's amateurism rules:  they set forth

the terms pursuant to which the Networks acquire broadcast rights from producers.

That is undisputed (RE001, Compl., PID#24-25, ¶113), and weighs against a

plausible inference of conspiracy.  *Twombly*, 550 U.S. at 557 (agreements that are

---

[16] The Sixth Circuit is free to affirm dismissal on any ground supported by the
record.  *See, e.g.*, *Hilliard v. U.S. Postal Serv.*, 814 F.2d 325, 326 (6th Cir. 1987).

"just as much in line with a wide swath of rational and competitive business strategy" do not support the existence of an antitrust conspiracy).

Plaintiffs do not—and cannot—plead facts suggesting that the Broadcast Agreements actually exist for the purpose of restricting student-athlete compensation. Any such allegation would be *entirely implausible* because such a conspiracy would make no sense. The NCAA's amateurism rules have prevented student-athletes from being paid since 1906, rendering the Network Defendants' purported participation in a conspiracy to restrict student-athlete compensation entirely superfluous. *See Int'l Logistics Grp.*, 884 F.2d at 907 (no vertical conspiracy where acquiescence of distributors was not essential to manufacturer's actions).

### 2.    The Network Defendants Are Not Parties to the NCAA Amateurism Rules.

It is axiomatic that a defendant cannot be held liable under Section 1 of the Sherman Act without being involved in the challenged agreement. *See, e.g.*, *Total Benefits*, 552 F.3d at 436 (dismissing a Section 1 claim because "nowhere did Plaintiffs allege when Defendants joined the Anthem conspiracy, where or how this was accomplished, and by whom or for what purpose.").

Here, Plaintiffs concede that the amateurism rules are "agreements between the NCAA and Conference Defendants." (RE001, Compl., PID#21-23,

¶¶97-104.)  They nowhere allege—nor could they—that the Network Defendants (or the Licensing Defendants) have ever been parties to those amateurism rules.

Plaintiffs resort to the vague assertion that the Network Defendants "effectually adopt and implement" the NCAA amateurism rules.  (RE001, Compl., PID#24, ¶112.)  But Plaintiffs' Complaint provides no factual allegations to support that claim, and does not even explain what it means.

To the extent Plaintiffs suggest that by purchasing broadcast rights from the NCAA, the Network Defendants became parties to the NCAA's rules, they depart from both logic and law.  That would mean every downstream purchaser from a conspirator would become a participant in the conspiracy—having "adopted and implemented" the conspiracy merely by transacting with a conspirator.  That is not the law.  *Monsanto*, 465 U.S. at 764 (in order for an agreement to violate Section 1, there must be "a meeting of minds in an unlawful arrangement"); *Kendall*, 518 F.3d at 1048 ("Merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act.").

### 3.     The NCAA Amateurism Rules Do Not Violate Section 1 of the Sherman Act.

There can be no unlawful conspiracy here because the NCAA's amateurism rules do not violate the Sherman Act.  (RE288, Memorandum, PID#2684-2687 (citing *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85,

101-02, 119-20 (1984); *Bassett*, 528 F.3d 426, 433 (6th Cir. 2008); *Gaines v. NCAA*, 746 F. Supp. 738, 744 (M.D. Tenn. 1990); *Smith v. NCAA*, 139 F.3d 180, 189 (3rd Cir. 1998), *vacated on other grounds*, 525 U.S. 459 (1999); *Agnew v. NCAA*, 683 F.3d 328, 341 (7th Cir. 2012)).)

The district court so concluded, following the binding authority laid down by this Circuit in 2008 in *Bassett v. NCAA* (RE288, Memorandum, PID#2687): "[the] NCAA's enforcement of its rules governing recruiting, improper inducements and academic fraud[] did not give NCAA a competitive advantage[;] rather, they were intended to ensure fair competition in intercollegiate athletics." *Bassett*, 528 F.3d at 433 (internal quotation marks omitted). The district court correctly relied on *Bassett* to support its holding that the NCAA amateurism rules at issue are noncommercial and do not violate the Sherman Act. The district court also properly followed the Supreme Court's reasoning in *Board of Regents*, which stated that the NCAA's amateurism rules are "entirely consistent with the goals of the Sherman Act." (RE288, Memorandum, PID#2685 (citing *Board of Regents*, 468 U.S. at 119).)

Plaintiffs rely on the Ninth Circuit's *O'Bannon IV* decision to support their claim that the NCAA amateurism rules are anticompetitive. (Br. 52.) But whatever the Ninth Circuit said in *O'Bannon IV*, the Sixth Circuit has held that the amateurism rules are noncommercial. *Bassett*, 528 F.3d at 433. Even the

43

*O'Bannon IV* analysis does not support Plaintiffs' claim because the Ninth Circuit concluded that the NCAA's restrictions on payments above the cost of attendance are valid.  *O'Bannon IV*, 802 F.3d at 1075-76.  (*See supra* footnote 13.)

## III.  THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' LANHAM ACT CLAIM.

Plaintiffs assert that Defendants violated Lanham Act Section 43(a)(1)(A) (15 U.S.C. § 1125).  To plead a Lanham Act claim, plaintiffs must plead that their names or images were used in commercial speech, *see Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003), in a way that falsely implied endorsement, *see Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009).  Their Complaint fails to do so.

### A.  Sports Broadcasts and Related Advertisements Are Not Commercial Speech.

Plaintiffs do not dispute that the Lanham Act regulates only commercial speech.  (Br. 41-44.)  *See, e.g.*, *Taubman*, 319 F.3d at 774.  Instead, Plaintiffs assert that sports broadcasts are "unquestionably commercial" for purposes of the First Amendment.  (Br. 43.)

But no court anywhere has found sports broadcasts or advertisements for such broadcasts to be "commercial speech" within the meaning of a constitutional analysis.  "Commercial" does not mean "for money" in this context.  "The fact that expressive materials are sold does not diminish the degree of

protection to which they are entitled under the First Amendment." *ETW*, 332 F.3d at 925.  Rather, "commercial speech" means "speech which does no more than propose a commercial transaction." *Id.* at 925 (internal quotation marks omitted); *see also Nichols v. Moore*, 334 F. Supp. 2d. 944, 955-56 (E.D. Mich. 2004). Broadcasting a sporting event does not "propose a commercial transaction"—it depicts a real event and distributes desired speech (sports programming) to the public.  Thus, it is not "commercial speech" for purposes of First Amendment jurisprudence.  *See Dryer III*, 55 F. Supp. 3d at 1189-1193 (clips of game footage are protected by the First Amendment because they are noncommercial speech and convey factual information about football games).

Similarly, advertisements for sports broadcasts and other programming are not commercial speech because the underlying content being promoted is not commercial speech.  *See, e.g.*, *Bolger v. Young Drugs Prods. Corp.*, 463 U.S. 60, 68 n.14 (1983) ("advertis[ing] an activity [that is] itself protected by the First Amendment" is not normally treated as commercial speech); *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995) ("[A]mple leeway must be accorded to statements that advertise books by expressing opinions . . . ."); *Rogers v. Grimaldi*, 695 F. Supp. 112, 124 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 994 (2d Cir. 1989) (holding that "[s]ince Fellini's right to use Rogers and Astaire as a cultural reference point in this film is protected, the related advertising

cannot be actionable"); *People v. Fogelson*, 577 P.2d 677, 681 n.7 (Cal. 1978)

("[C]ommercial solicitation or promotion of constitutionally protected . . . works is

protected as an incident to the First Amendment value of the underlying speech or

activity.").

   Plaintiffs mistakenly rely on *Jordan v. Jewel Food Stores, Inc.*, 743

F.3d 509, 516 (7th Cir. 2014), and *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 114

(6th Cir. 1995). Those cases held speech to be commercial when it promotes

*products*—not other speech—specifically supermarkets (in *Jordan*) and copper

plunger tips (in *Semco*). Neither case holds that sports broadcasts or related

advertisements could be commercial. Indeed, the Minnesota district court in

*Dryer III* considered *Jordan* and concluded that it was inapplicable to the

rebroadcast of NFL footage in football documentaries: "[U]nlike the work at issue

in *Jordan*, the productions at issue here are not advertising. . . . Nor do the

productions exploit players' images for the singular purpose of brand enhancement

or other commercial gain. Instead, the productions tell the story of a football game

. . . ." *Dryer III*, 55 F. Supp. 3d at 1191-92; *see also Cardtoons, L.C. v. Major

League Baseball Players Ass'n*, 95 F.3d 959, 969-70 (10th Cir. 1996) (holding that

baseball cards are protected noncommercial speech as "an important means of informing the public about baseball players").[17]

### B. The Complaint Fails Plausibly To Allege False Endorsement.

Plaintiffs wrongly contend that the district court erred by not conducting a full eight-factor likelihood-of-confusion test. (Br. 36.) But courts employ that test only if the "defendants are using the challenged mark in a way that *identifies the source of their goods*." *Hensley*, 579 F.3d at 610 (emphasis added) (internal quotation marks omitted). "If they are not, then the mark is being used in a 'non-trademark way' and trademark infringement laws, along with the eight-factor analysis, do not even apply." *Id.* at 610. As a result, the district court properly dismissed Plaintiffs' Lanham Act claim at the motion to dismiss stage without reaching the eight-factor test. *See Hensley Mfg.*, 579 F.3d at 610-11; *see also Dryer III*, 55 F. Supp. 3d at 1203.

Notably, Plaintiffs rely on the *dissent* in *ETW* to argue that a jury should decide the likelihood of confusion issue (Br. 38, 40), ignoring the fact that

---

[17] Contrary to Plaintiffs' argument (Br. 44), courts commonly find speech to be noncommercial at the motion to dismiss stage, before discovery. *See, e.g.*, *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 41 (D.D.C. 2012) (dismissing Lanham Act claim after holding that "[b]ecause the expression cannot be characterized as commercial speech, the Lanham Act does not apply"); *Burnett v. Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962, 974 (C.D. Cal. 2007) (dismissing celebrity's Lanham Act claim against television network for use of image on TV show because show was noncommercial speech).

the *majority* in *ETW* rejected this argument, and concluded that "[n]o reasonable person could believe that merely because these photographs or paintings contain Woods's likeness or image, they all originated with Woods." *ETW*, 332 F.3d at 922.

In their Brief on appeal, Plaintiffs challenge the district court's conclusion that there is no plausible allegation of false endorsement or consumer confusion by referring to various passages of their Complaint. (Br. 38-39.) But Plaintiffs are mistaken.

- Plaintiffs first cite passages that merely recount the broadcasts in which each of them appeared during his career. (Br. 38 (citing RE001, Compl., PID#5-9, ¶¶11-20).) They do not explain how basketball players playing basketball or football players playing football could be plausibly interpreted as endorsing the broadcast or causing any consumer confusion.

- Plaintiffs also assert that Defendants have used their names and images "for the explicit purpose of promoting the airings, increasing brand awareness and driving revenue to themselves" and that they "are highly recognizable to consumers deciding whether to watch or order the . . . broadcasts." (Br. 38-39 (citing RE001, Compl., PID#35-36, ¶¶178, 180-181).) But the Lanham Act does not provide a cause of action for claims that the appearance of someone's name or image in a non-fiction program

somehow implied an endorsement of the publisher of that program—*see, e.g.*, *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585 (2d Cir. 1990) (holding that photographs of Babe Ruth used in a calendar "do not in any way indicate sponsorship")—and the "use of game footage as game footage cannot, as a matter of law, cause confusion or mistake or deceive anyone," *see Dryer III*, 55 F. Supp. 3d at 1203.

•    Plaintiffs refer to Defendants' purported use of Plaintiffs' names, images, and likenesses to advertise "non-sports related content." (Br. 39-40 (citing RE001, Compl., PID#11, 34, ¶¶33, 176).) As the district court concluded, it is "simply implausible to conclude that the shooter or those along the key were in anyway endorsing the upcoming [CBS] program [*CSI*], any more than Tennessee Titans players, their opponents, or spectators endorse Louisiana-Pacific building products (or, indeed, any of the host of other products displayed on the scoreboard) when games are played at LP field, even though such advertisements may be captured in the background during the game." (RE288, Memorandum, PID#2692-93.) Under Plaintiffs' implausible theory, almost anyone whose image appears on television would have a false endorsement claim against the broadcaster.

Contrary to Plaintiffs' assertion, they are not entitled to discovery to gather facts that could establish a Lanham Act claim (Br. 41), where such a claim

is implausible and thus dismissible on its face. *See Hensley Mfg.*, 579 F.3d at 610-11.

**C.    Even if Plaintiffs Had Properly Pleaded Endorsement, the *Rogers* Test Would Apply and Bar Plaintiffs' Claims.**

Even if Plaintiffs had pleaded false endorsement, the *Rogers* test, not the eight-factor likelihood of confusion test, would apply. "[W]here the defendant has articulated a colorable claim that the use of a celebrity's identity is protected by the First Amendment, the likelihood of confusion test is not appropriate because it fails to adequately consider the interests protected by the First Amendment." *ETW*, 332 F.3d at 926. When freedom of expression is at issue, the Sixth Circuit applies the test adopted in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). *See ETW*, 332 F.3d at 928 ("In *Parks*, we adopted the *Rogers* test as the law of the Sixth Circuit.").

*Rogers* provides that the First Amendment protects an expressive work from a Lanham Act claim if "the use of the celebrity's image has artistic relevance, unless it is used in such a way that it explicitly misleads as to the source of the work." *ETW*, 332 F.3d at 928. The *Rogers* test would clearly apply here because sports broadcasts and related advertisements are noncommercial speech. *Id.* at 925. Athletes plainly are *relevant* to the games in which they compete, and the Complaint does not allege (nor could it) that the Networks *explicitly mislead* viewers into believing that Plaintiffs sponsor their broadcasts.

50

## IV.   THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' OTHER STATE LAW CLAIMS.

Plaintiffs do not dispute that if their right of publicity, Sherman Act, and Lanham Act claims are dismissed, then their remaining claims for accounting, civil conspiracy, and unjust enrichment fail.  (Br. 55.)

As Plaintiffs concede (RE257, Opp'n Br., PID#1916), their accounting cause of action must be dismissed for the added reason that they have alleged no fiduciary relationship, a precondition for any accounting action.  *See Law v. Bioheart, Inc.*, No. 2:07–CV–2177, 2009 WL 693149, at *16 (W.D. Tenn. Mar. 13, 2009).

## V.   COPYRIGHT PREEMPTION AND THE FIRST AMENDMENT PROVIDE ALTERNATIVE BASES FOR AFFIRMING THE DISTRICT COURT.

In the district court, Defendants raised additional grounds for dismissal of Plaintiffs' state law, right of publicity, and Lanham Act claims that the district court did not reach.  This Court need not reach them either.  However, because this Court may affirm on the basis of any point raised below, we repeat them here.  *See Dixon v. Clem*, 492 F.3d 665, 673 (6th Cir. 2007).

### A.   The Federal Copyright Act Preempts the State Law Claims.

The Copyright Act preempts state law claims that (i) fall within the general subject matter of copyright; and (ii) involve state law rights that are "equivalent" to any of the exclusive rights within the scope of federal copyright

protection.  *See* 17 U.S.C. § 301; *Stromback v. New Line Cinema*, 384 F.3d 283, 300 (6th Cir. 2004).  Sports broadcasts satisfy both prongs: (i) they are "audiovisual works" that are "fixed in a tangible medium of expression," and thus fall within the subject matter of copyright (17 U.S.C. § 102(a)); and (ii) the "crux" of Plaintiffs' state law claims is that when the networks broadcast their performances, their purported rights have been "infringed by the mere act of reproduction, performance, distribution or display" of those performances.  *Balt. Orioles*, 805 F.2d at 673 (citation omitted).

Both *Ray v. ESPN, Inc.*, 783 F.3d 1140 (8th Cir. 2015) and *Baltimore Orioles*, 805 F.2d at 673, support preemption of Plaintiffs' right of publicity claims by the Copyright Act.  In *Ray*, a case involving a former wrestler suing ESPN for infringing his publicity rights, the Eighth Circuit affirmed dismissal of his claims, holding that "his state-law rights are equivalent to the exclusive rights within the general scope of copyright."  *Ray*, 783 F.3d at 1144 (internal quotation marks omitted).  In *Baltimore Orioles*, the Seventh Circuit held that "any rights of publicity in [baseball players'] performances that are equivalent to the rights contained in the copyright of the telecast are preempted."  *Balt. Orioles*, 805 F.2d at 677.[18]  Notably, in *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 623 (6th

---

[18] *See also Dryer III*, 55 F. Supp. 3d at 1200-02; *Somerson v. McMahon*, 956 F. Supp. 2d 1345, 1355 (N.D. Ga. 2012); *Armstrong v. Eagle Rock Entm't*, 655 F. Supp. 2d 779, 789-90 (E.D. Mich. 2009); *Maloney v. T3Media, Inc.*, 94 F. Supp.

Cir. 2000), this Court pointed to *Baltimore Orioles* as the prototypical example of a case where there would be preemption of publicity rights claims.

### B.    The First Amendment Would Also Bar Plaintiffs' Purported Rights of Publicity.

#### 1.    The First Amendment Protects Noncommercial Speech About Matters of Public Interest.

If a state were to grant all participants in a sporting event the rights of publicity that Plaintiffs claim (which could amount to "veto rights" over the broadcast of the events themselves), that would violate the First Amendment.

The First Amendment provides that if the media "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need . . . of the highest order." *Bartnicki v. Vopper*, 532 U.S. 514, 528 (2001) (omission in original) (internal quotation marks omitted).  Consistent with that principle, the two most important factors courts identify in this context are (i) whether the challenged content is noncommercial speech and (ii) whether it relates to a matter of public concern, both of which are satisfied here.  (*See supra* pages 19, 45-47.) Applying those factors, multiple courts have held that factual depictions of sports

---

3d 1128, 1135-39 (C.D. Cal. 2015).  Appeals are pending in both *Dryer* and *Maloney*.

and other real events are protected by the First Amendment from right of publicity claims.[19]

      If the Court reaches the First Amendment issue, Plaintiffs contend that *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977), supports the proposition that they are "performers" whose "entire acts" within NCAA games are broadcast, and so the First Amendment would permit their claims.  (Br. 44-45.) The district court correctly found that *Zacchini* does not support the chaotic rights regime Plaintiffs propose.  (RE288, Memorandum, PID#2677-78.)

      Rather, *Zacchini* is about the right to publicize (by way of broadcasting) entire entertainment *events*, not the names or likenesses of participants within such events.  The plaintiff in *Zacchini* put on a human cannonball act.  After a local television station filmed and broadcast his entire (15-second) act on the news, the Ohio Supreme Court found that he could sue the station for usurping his right to license his entire show for broadcast.  The state court labeled his cause of action, perhaps inartfully, as a "right to the publicity value of his performance."  *Zacchini*, 433 U.S. at 565.

---

[19] *See, e.g.*, *C.B.C. Distrib. & Mktg. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 824 (8th Cir. 2007) (fantasy baseball games are protected by the First Amendment); *Matthews v. Wozencraft*, 15 F.3d 432, 440 (5th Cir. 1994) (a biography); *Nichols*, 334 F. Supp. 2d at 956 (a documentary about gun violence); *Gionfriddo*, 114 Cal. Rptr. 2d at 315 (video clips of game footage on Major League Baseball's website); *Dryer III*, 55 F. Supp. 3d at 1193 (NFL documentaries using game footage are "not commercial speech and are instead entitled to full protection under the First Amendment.").

But the Supreme Court recognized that Zacchini did not rely on the publicity theory that is typically recognized by state laws, *i.e.*, a right to control the use of his name and image. *Zacchini*, 433 U.S. at 574 n.10 (plaintiff "does not merely assert that some general use, such as advertising, was made of his name or likeness"). Rather, Zacchini's claim was essentially the same one asserted by other event producers, dating back to the 1930s, who have successfully asserted the right to license the broadcast of the events they produced. (*See supra* footnote 11.) Zacchini's cannonball act was unusual in that it was a one-man show—so he was both its producer and performer. But the Court's decision is clearly grounded in his rights as *producer*, and is thus consistent with broadcasting law as it has always been applied by the states. *See id*. at 576 ("Of course, Ohio's decision to protect petitioner's right of publicity here . . . provides an economic incentive for him to make the investment required to *produce* a performance of interest to the public." (emphasis added)). The Court emphasized that Zacchini should be entitled to the same basket of rights to which other producers are entitled, including not only the right to license broadcasting rights to his entire event, but also the right to charge admission fees—something that only event producers (as opposed to participants) can do. *Id*. at 575-76.

*Zacchini* held that as long as state laws protecting such producer rights are confined to broadcasting entire events—in Zacchini's case, his "entire

act"—they function much like copyright laws and are therefore not constrained by the First Amendment because, like patent and copyright laws, they "afford greater encouragement to the *production* of works of benefit to the public." *Id.* at 577 (emphasis added).

Here, *Zacchini*'s balancing analysis tilts exactly the other way. A chaotic regime of "rights of publicity" granting rights to every individual participant in a team sporting event would *destroy* incentives for producers to create such works by massively complicating their commercial exploitation. *Zacchini* found that producers' rights are so important that they may outweigh First Amendment interests. Plaintiffs, in sharp contrast, seek to undermine producers' rights so severely as to render them valueless, and would do so without furthering any First Amendment interest.[20]

>    2.    The *Rogers* Test Bars the State Law and Right of Publicity Claims.

This Court has also applied *Rogers* to the right of publicity. *Parks v. LaFace Records*, 329 F.3d 437, 461 (6th Cir. 2003). In the publicity context, the test protects expressive works unless a plaintiff's identity was "wholly unrelated" to the underlying work, or was "simply a disguised commercial advertisement for

---

[20] Other courts have correctly construed *Zacchini* to protect the rights of sporting event producers, such as sports leagues, not the names and images of any of the hundreds of people who might participate in sports events. *See, e.g.*, *WIAA*, 658 F.3d at 629; *Post Newsweek*, 510 F. Supp. at 84-85.

the sale of goods or services." *Id.* (quoting *Rogers*, 875 F.2d at 1004).  Here, the

athletes are undisputedly related to the game broadcasts, and those broadcasts are

not merely subterfuge to sell products.[21]  Accordingly, under *Rogers*, Plaintiffs'

claims are barred for this additional reason.

## VI.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DISMISSING PLAINTIFFS' COMPLAINT WITH PREJUDICE.

The Sixth Circuit "review[s] the decision to dismiss with prejudice for

abuse of discretion."  *Shepherd v. Wellman*, 313 F.3d 963, 971 (6th Cir. 2002).

Plaintiffs never filed a motion to amend their Complaint.  Therefore, it

was not an abuse of discretion for the district court to dismiss the Complaint with

prejudice.  (RE288, Memorandum, PID#2694 (citing *La. Sch. Bd. Emps.' Ret. Sys.

v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th  Cir. 2010))); *see also Winget v. JP

Morgan Chase Bank, N.A.*, 537 F.3d 565, 572 (6th Cir. 2008) ("The district court

does not abuse its discretion in failing to grant a party leave to amend where such

leave is not sought." (internal quotation marks omitted)).  Plaintiffs cannot use the

court as a "sounding board to discover holes in their arguments . . . ."  *Leisure

Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 616 (6th Cir. 2010); *see

also Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444-45 (6th Cir. 2014).

---

[21] *Rogers* appropriately reflects that the right of publicity is a content-based regulation of speech that should be subject to strict scrutiny.  *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015).

Plaintiffs offer the flimsy explanation that "the legal landscape of big-time collegiate sports is changing." (Br. 55-56.) But this wait-and-see rationale is precisely the type of explanation this Court has properly rejected.

Granting leave to amend would in any case be futile because no complaint could state Plaintiffs' purported claims against the Network Defendants. *See SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 355 (6th Cir. 2014) ("[C]ourts need not give leave to amend when doing so would be futile. Amending would be futile if a proposed amendment would not survive a motion to dismiss." (citations omitted)); *Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 383 (6th Cir. 1993).

Plaintiffs' claims were not dismissed due to a lack of specificity; they were dismissed because, at their core, they are legally meritless. *See Winget*, 537 F.3d at 573. Plaintiffs candidly admit in their opening brief that any amendment would have been futile:

> The lower court's central holding was that Plaintiffs had no enforceable rights of publicity for which relief could be granted. Following the lower court's reasoning, there would have been *no* set of facts that Plaintiffs could have alleged to stake an actionable claim for relief.

(Br. 56.)

No amendment could change the fact that Plaintiffs have no rights of publicity in sports broadcasts or related advertisements. No amendment could

change the facts that the Network Defendants did not cause any injury (including

antitrust injury), nor did they enter any unlawful agreement in violation of the

Sherman Act.  And no amendment could change the fact that the Lanham Act does

not apply to noncommercial speech, such as game broadcasts or related

advertisements.

## CONCLUSION

Network Defendants respectfully submit that the district court

properly dismissed Plaintiffs' claims with prejudice.  The judgment should be

affirmed.

Dated:  December 18, 2015

Respectfully submitted,

/s/ Evan R. Chesler
Evan R. Chesler
Roger G. Brooks
J. Wesley Earnhardt
**CRAVATH, SWAINE & MOORE LLP**
 *Attorneys for Defendants-Appellees ESPN,*
  *Inc., ABC, Inc., ESPN d/b/a SEC Network*
  *and ESPN d/b/a Longhorn Network*

/s/ James W. Quinn
James W. Quinn
Yehudah L. Buchweitz
Gregory Silbert
Eric S. Hochstadt
**WEIL, GOTSHAL & MANGES LLP**
R. Dale Grimes
Jeffrey P. Yarbo
**BASS, BERRY & SIMS PLC**
*Attorneys for Defendant-Appellee CBS*
*Broadcasting Inc.*

/s/ Arthur J. Burke
Arthur J. Burke
Dana M. Seshens
**DAVIS POLK & WARDWELL LLP**
R. Dale Grimes
**BASS, BERRY & SIMS PLC**
*Attorneys for Defendant-Appellee*
*NBCUniversal Media, LLC (sued as*
*National Broadcasting Company, Inc.)*

/s/ Kevin T. Baine
Kevin T. Baine
**WILLIAMS & CONNOLLY LLP**
*Attorney for Defendants-Appellees Fox*
*Broadcasting Company (sued as FOX, Inc.)*
*and Big Ten Network, LLC (sued as Big Ten*
*Network Services, LLC)*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because the brief contains 13,971 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 6 Cir. R. 32(b)(1).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

the brief has been prepared in a proportionally spaced typeface using

Microsoft Word 2007 in Times New Roman 14-point font.


Date:  December 18, 2015

/s/ Evan R. Chesler
Evan R. Chesler

*Attorney for Defendants-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2015, the foregoing Brief of Network Defendants-Appellees was filed via this Court's CM/ECF system and thereby was served upon all counsel of record.

Signed at New York, New York, on December 18, 2015.

<u>/s/ Evan R. Chesler</u>
Evan R. Chesler

*Attorney for Defendants-Appellees*

## RULE 30(G) DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry No. | Description | Date | PID# Range |
|---|---|---|---|
| 001 | Complaint | 10/03/14 | 1-40 |
| 214 | Conference Defendants' Motion to Dismiss | 12/10/14 | 769-781 |
| 215 | Memorandum in Support of Conference Defendants' Motion to Dismiss | 12/10/14 | 782-814 |
| 218 | Licensing Defendants' Motion to Dismiss | 12/10/14 | 829-837 |
| 219 | Memorandum in Support of Licensing Defendants' Motion to Dismiss | 12/10/14 | 838-855 |
| 220 | Network Defendants' Motion to Dismiss | 12/10/14 | 856-868 |
| 221 | Memorandum in Support of Network Defendants' Motion to Dismiss | 12/10/14 | 869-931 |
| 224 | Defendants' Motion to Stay Discovery | 12/10/14 | 1269-1284 |
| 225 | Memorandum in Support of Defendants' Motion to Stay Discovery | 12/10/14 | 1285-1310 |
| 243 | Plaintiffs' Response in Opposition to Defendants' Motion to Stay Discovery | 01/08/15 | 1667-1682 |
| 252 | Defendants' Reply to Plaintiffs' Response in Opposition to Defendants' Motion to Stay Discovery | 01/29/15 | 1793-1813 |
| 255 | Order Granting Defendants' Motion to Stay Discovery | 02/05/15 | 1865-1866 |
| 257 | Plaintiffs' Response in Opposition to Network Defendants' Motion to Dismiss | 02/13/15 | 1874-1923 |

| Record Entry No. | Description | Date | PID# Range |
|---|---|---|---|
| 258 | Plaintiffs' Response in Opposition to Conference Defendants' Motion to Dismiss | 02/13/15 | 1924-1947 |
| 259 | Plaintiffs' Response in Opposition to Licensing Defendants' Motion to Dismiss | 02/13/15 | 1948-1959 |
| 261 | Case Management Conference Transcript for 02/05/15 Hearing Before Chief Judge Kevin Sharp | 02/18/15 | 2168-2204 |
| 268 | Conference Defendants' Reply to Plaintiffs' Response in Opposition to Conference Defendants' Motion to Dismiss | 03/06/15 | 2231-2258 |
| 269 | Network Defendants' Reply to Plaintiffs' Response in Opposition to Broadcast Defendants' Motion to Dismiss | 03/06/15 | 2267-2305 |
| 271 | Licensing Defendants' Reply to Plaintiffs' Response in Opposition to Licensing Defendants' Motion to Dismiss | 03/06/15 | 2401-2421 |
| 280 | Motion to Dismiss Hearing Transcript | 04/28/15 | 2513-2599 |
| 285 | Order Dismissing Plaintiffs' Claims with Prejudice | 06/04/15 | 2659-2660 |
| 288 | Chief Judge Kevin H. Sharp's Memorandum in Support of Order Dismissing Complaint with Prejudice | 06/08/15 | 2663-2695 |
| 289 | Notice of Appeal | 07/01/15 | 2696-2702 |